JUDGE BERMAN

14 CV        8495

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRVING FIREMEN'S RELIEF AND RETIREMENT FUND, Individually and on Behalf of all Others Similarly Situated,<br><br>           Plaintiff,<br><br>   v.<br><br>TESCO PLC, PHILIP CLARKE, and LAURIE MCILWEE<br><br>          Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

RECEIVED
OCT 2 3 2014
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Irving Firemen's Relief and Retirement Fund ("Plaintiff"), by and through the undersigned attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by Tesco PLC ("Tesco" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by Tesco; and (c) a review of other publicly available information concerning Tesco.

### <u>SUMMARY OF THE ACTION AND OVERVIEW</u>

1.     This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired American Depositary Shares ("ADRs") (the "Class") from February 2, 2014 and September 22, 2014 inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Tesco and certain of its officers for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Tesco is a multinational grocery and general merchandise retailer headquartered in Cheshunt, Hertfordshire, England, United Kingdom ("UK"). Tesco is one of the world's largest retailers with stores in 12 countries, including the UK. Tesco is the grocery market leader in the UK with over 3,300 stores and 310,000 employees.

3.      Throughout the Class Period, Defendants made false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose the truth regarding the Company's financial condition.

4.      Specifically, on September 22, 2014, Tesco surprised the market when it announced that it had overstated its expected profit for the half year because it had improperly accelerated recognition of income and delayed accrual of certain costs. The Company further stated that profits were overstated by approximately £250m ($402 million) or 23%. The Company further announced that it had suspended the managing director of its UK business along with its UK director and two food directors. On this news, Tesco ADRs plummeted 15% from $11.29 on September 19, 2014 and declined to $9.61 per share on September 22, 2014 on unprecedented volume.

5.      As a result of Defendants' wrongful acts and omissions, Tesco ADRs traded at artificially inflated prices during the Class Period, and Plaintiff and other Class members suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.

§240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

7.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27(c) of the Exchange Act (15 U.S.C. §78aa(c)). Many of the acts complained of herein, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants occurred, at least in part, in this District.   Additionally, Tesco's agent for service is located at 570 Lexington Avenue, 44th Floor, New York, NY 10022.

8.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

9.      Plaintiff Irving Firemen's Relief and Retirement Fund, as set forth in the accompanying certification, incorporated by reference herein, purchased Tesco ADRs during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

10.      Defendant Tesco is a multinational grocery and general merchandise retailer headquartered in Cheshunt, Hertfordshire, England, United Kingdom. Tesco ADRs are traded on the over-the-counter ("OTC") market  under the symbol "TSCDY."

11.      Defendant Philip Clarke ("Clarke") was the Chief Executive Officer ("CEO") of Tesco. Clarke announced he was leaving Tesco's Board of Directors ("Board") effective October 1, 2014, which was brought forward to September 1, 2014.

12.     Defendant Laurie McIlwee ("McIlwee") was the Chief Financial Officer ("CFO") of Tesco. In April 2014, McIlwee resigned as CFO but agreed to remain in his role until a successor took over. McIlwee began his Tesco career as UK finance director in 2000 and soon rose to become distribution director.

13.     Defendants Clarke and McIlwee are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Tesco's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants made specific false and misleading statements and/or reviewed and approved the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

14.     Each Individual Defendant's primary liability and controlling person liability arises from the following facts, among others: (a) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior officers of the Company, were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (c) each Individual Defendant enjoyed significant personal contact and familiarity with

4

the other Individual Defendants and were advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

15.    Tesco and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

16.    Tesco operates as a grocery retailer. The Company operates stores in 12 countries that primarily offer food, groceries, clothing, and general merchandise. Tesco is the largest retailer in the UK with over 3,300 stores and 310,000 employees. Tesco is one of the top retailers in the world by annual sales, behind US giant Wal-Mart Stores Inc. and France's Carrefour SA.

17.    Although built on the "pile it high, sell it cheap" creed of founder Sir Jack Cohen, Tesco abandoned its discount format to become a multi-format retailer in stores and online. Among its banners are Tesco Extra superstores; Tesco Express, Tesco Metro, and One Stop convenience stores; Homeplus hypermarket, small express, and virtual stores in South Korea; and Dobbies gardening stores in the UK, Scotland, and Northern Ireland.

18.    The Company was founded in 1919 and is based in Cheshunt, UK.

### Materially False and Misleading
### Statements Issued During the Class Period

19.    On February 2, 2014, the first day of the Class Period, the Company published its 2014 Annual Report and Financial Statements ("Annual Report"). In the Annual Report, the Company stated the following regarding "Recognition of commercial income."

5

*Commercial income (promotional monies, discounts and rebates receivable from suppliers) recognised during the year is material to the income statement and amounts accrued at the year end are judgemental.*

\* \* \*

We agreed commercial income recognised to contractual evidence with suppliers, *with particular attention to the period in which the income was recorded and the appropriateness of the accrual at the year end.*

[Emphasis added.]

20.     In its Annual Report, the Company reported the following regarding sales and profits:

> Group sales for the year were £70.9 billion [$118 billion], an increase of 0.3% at actual exchange rates. Full-year trading profit for our continuing operations declined (6.0)% to £3.3 billion [$5.5 billion].

21.     Sales had fallen from £72.4 billion in 2012/2013, which is a 0.2% fall at constant exchange rates. Tesco's operating profit fell by 6.7% at constant exchange rates to £3.3 billion. While the UK resisted somewhat, the operating income plummeted by 6.8% in Asia and 32.8% in Europe (excluding the UK).

22.     In its Annual Report, the Company stated the following regarding "Fraud, compliance and control:"

- Procedures and controls are set out across the business to reduce fraud and compliance risks, including our Group Accounting Policy, key financial controls, IT access controls and segregation of duties
- Compliance Committees monitor the implementation of, and compliance with, relevant laws, policies and procedures
- Training is provided to help colleagues comply with policies and procedures
- Clear behavioural guidance is given to employees through training on Tesco Values, the Group Code of Business Conduct, the UK Bribery Act and our Whistleblowing service – Protector Line
- Internal Audit undertakes a risk-based programme with detailed investigations into all business areas and reports its findings to management and the Audit Committee

- Group Loss Prevention & Security monitors fraud, bribery and business continuity risks across the Group and reports its findings to the Audit Committee
- Store and distribution compliance and technical law and trading reviews are conducted regularly to reinforce compliance across the Group
- A comprehensive compliance programme is in place to promote, monitor and review compliance with the UK Groceries Supply Code of Practice
- The Information Security Committee regularly reviews IT incidents
- External Audit rotates its coverage of areas and assessment of controls

23.     As of February 2014, amongst the UK's supermarkets, Tesco had the dominant market share of around 30%, compared to the 17% each of next largest J. Sainsbury PLC ("Sainsbury") and Asda Stores Ltd. ("Asda"). Tesco is also the only UK supermarket to have branched out overseas.

24.     During the Christmas period, Tesco's online grocery sales rose 10%, general merchandise improved 25%, and clothing surged 70%. In total, the online business generated £2.7 billion in sales and £127 million in profit. In addition, the Company's new "Click and Collect" service has proven to be very popular with customers, taking £1 billion in sales during the five days before Christmas.

25.     On April 4, 2014, the Company announced that its CFO Laurie McIlwee, a Tesco veteran of 14 years, had resigned. McIlwee would remain as CFO until a successor was found.

26.     On April 16, 2014, Tesco released its 2013/2014 Group results. The Company's underlying profit before tax from continuing operations was down 6.9% at £3,054 million, compared to a year ago. Underlying diluted earnings per share were down 5%. Group profits were down for the second year in a row, falling to £3.3 billion from £3.5 billion in 2014, a fall of 6% against a 12% fall the year prior. The Company's profits were impacted by a "weakening" UK grocery market and challenging trading conditions overseas. The UK business, which

accounts for over 65% of Tesco's total profits, was down for the third consecutive year. Tesco's share of the UK grocery market reached a 10-year low.

27.    On the same day, the Company stated it invested about $336 million in upgrades for its stores to regain customer loyalty.

28.    Tesco had been growing its market share for a long time and had peaked at 31.7% in 2007. Tesco has significant overseas operations, unlike its rivals, but discounters Aldi and Lidl are building their UK operations by opening stores at a rapid rate and competing on price.

29.    On May 1, 2014, Tesco announced it was cutting prices on over 30 basic goods as well as making online shopping cheaper for both customers who want a full delivery to their door and those who use the Click & Collect service. The Company had previously launched "price promise," which compared prices at the tills and issued coupons if customers' shopping would have been cheaper at Asda or Sainsbury.

30.    On June 4, 2014, Tesco reported its first-quarter results where the Company announced a sharp fall in first-quarter sales, hurt by price cuts and subdued consumer spending. The Company also announced a 3.8% fall in like-for-like sales in the UK and that international sales "increased by 0.5% at constant exchange rates, with a significant currency impact resulting in a sales decline of (8.0)% at actual rates." CEO Clarke stated the following:

> Our accelerated plans are making a real difference for customers and we are more competitive than we have been for many years.
>
> * * *
>
> The first quarter has also seen a continuation of the challenging consumer trends in the UK, reflecting still subdued levels of spending in addition to the more structural changes taking place across the retail industry.

31.    Clarke also stated that he was continuing with his plan of refreshing large stores, cutting prices of essential items, and retraining staff, which he felt would be enough to stop the

defection of customers to discount competitors. Clarke told reporters, "I'm not going anywhere, I'm going to see through the fundamental reshaping of Tesco."

32.     On June 27, 2014, during the Company's Annual Shareholder Meeting, Clarke stated that Tesco needed more time improve stores, alter shop formats, and cut prices to fight competition. Specifically, Clarke stated that "[i]t's not happening overnight" and that "[t]he changes we are undertaking are the most radical for generations."

33.     On July 10, 2014, the Company announced that it had recruited Marks & Spencer Group PLC CFO Alan Stewart ("Stewart"). The Company reported that Stewart would replace McIlwee, whose departure was announced in April amid reports of differences over strategy with Clarke.

34.     Clarke stated that Stewart had the depth of experience to "play a leading role in the transformation of Tesco." Clarke further stated "[Tesco] wanted a candidate who had the right blend of experience, leadership and values to play a leading role in the transformation of Tesco. We have found all three in [Stewart]."

35.     On July 18, 2014, Tesco unveiled plans for 4,000 new homes across the U.K. on sites originally earmarked for supermarkets, more than a year after deciding to open fewer big stores in its domestic market. The Company stated that it was working on plans for the homes "either by building them ourselves or selling our sites to housing developers." The Company further stated that it had scrapped 100 major store developments in April 2013 and wrote down the value of sites that were acquired over five to ten years by £804 million ($1.4 billion) to reflect a drop in property values. The Company also stated that it was focusing on what it believed to be the fastest growing areas in food retailing—online and convenience stores—in an effort to reclaim market share lost to discount competitors.

36.     On July 21, 2014, the Company issued its second profit warning of 2014. The Company stated:

> Current trading conditions are more challenging than we anticipated at the time of our first quarter interim management statement on 4th June. The overall market is weaker and, combined with the increasing investments we are making to improve the customer offer and to build long term loyalty, this means that sales and trading profit in the first half of the year are somewhat below expectations.

37.     The Company also announced that Unilever's David Lewis ("Lewis") would replace Philip Clarke as CEO and that sales and trading profit in the first half of the year were below expectations. The Company further announced that Lewis would assume the CEO position officially on October 1, 2014, with Clarke staying on to support a transition until January 2015. In response to the announcement, Tesco Chairman Richard Broadbent stated:

> Having guided Tesco through a substantial re-positioning in challenging markets, Philip Clarke agreed with the board that this is the appropriate moment to hand over to a new leader with fresh perspectives and a new profile.

38.     On July 29, 2014, Kantar World panel data reported that Tesco had its worst sales decline in two decades. Tesco's sales fell 3.8% in the 12 weeks ended July 20, 2014, the steepest decline since comparable records began in 1994.

39.     On August 29, 2014, Tesco slashed its interim dividend by 75% as tough trading conditions forced it to cut its profit forecast for the second time in two months.

**The Truth Finally Emerges**

40.     On September 22, 2014, Tesco issued a press release whereby it stunned the market by announcing that during its final preparations for the forthcoming interim results, "it [had] identified an overstatement of its expected profit for the half year, principally due to the accelerated recognition of commercial income and delayed accrual of costs."

41.     The Company further stated that based on its preliminary investigation into the UK food business, "the Board believes that the guidance issued on 29 August 2014 for the Group profits for the six months to 23 August 2014 was overstated by an estimated [£]250m" (approximately $402 million).

42.     In response to the release, Lewis stated: "We have uncovered a serious issue and have responded accordingly.   The Chairman and I have acted quickly to establish a comprehensive independent investigation.   The Board, my colleagues, our customers and I expect Tesco to operate with integrity and transparency and we will take decisive action as the results of the investigation become clear."

43.     The overstatement concerned specific treatment of commercial income and costs from UK suppliers as well as extra incentives, often called "rebates," that Tesco received from suppliers for hitting a certain level of sales or for support for promotions.

44.     Tesco also announced that it had suspended four executives after discovering that profit estimates had been overstated: UK managing director Chris Bush, UK finance director Carl Rogberg, commercial director John Scouler, and food sourcing director Matt Simister.

45.     The Company also announced that it had retained accountants from Deloitte LLP ("Deloitte") to undertake an independent and comprehensive review of the accounting issues and work with Freshfields Bruckhaus Deringer LLP, the Company's external legal advisers. The investigation required that executives hand over their laptops and be interrogated.

46.     On this news, Tesco ADR's stock plummeted 15% from $11.29 on September 19, 2014 and reached $9.61 per share on September 22, 2014 on unprecedented volume.  All told, *the stock dropped approximately 43%* from its Class Period high of $16.97.  On September 24,

2014, the Financial Reporting Council ("FRC") announced it was monitoring Tesco's situation. The FRC stated:

> The FRC is monitoring the situation following Tesco's announcement closely. The FRC has disciplinary powers in relation to misconduct by accountants and, through the Financial Reporting Review Panel, can also require a company to restate its financial statements. The FRC does not have powers to monitor or require restatement of unaudited trading statements. It will consider the outcome of the investigation announced by the company and determine whether it should take regulatory action.

47.    On October 1, 2014, the Financial Conduct Authority ("FCA"), Britain's top financial watchdog, announced that it was investigating Tesco regarding its accounting problems. The Company stated "Tesco will continue to co-operate fully with the FCA and other relevant authorities considering this matter."

48.    On October 14, 2014, Tesco announced that it had suspended three more executives amid an investigation into the Company's accounting practices. The three new executives were in charge of parts of Tesco's UK food business: William Linnane oversaw the impulse-purchase unit; Dan Jago oversaw the wines and spirits; and Sean McCurley oversaw the convenience-store operations. In fact, 10 of the Company's most senior staff have been suspended, asked to leave, or have stepped down from the Company.

49.    On October 23, 2014, Tesco's earnings statement confirmed that Tesco had overstated profit figures for the first half of 2014 by £263 million ($421 million)—more than the £250 million originally estimated. The Company has also been forced to scrap its full-year outlook because of "uncertainties" over its future performance.  Although the whole sum will be reflected in Tesco's current-year earnings, the Company said £145 million ($232 million) of the overstatement related to its two previous financial years.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or otherwise acquired ADRs from February 2, 2014 and September 22, 2014 inclusive.

51.    Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

52.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tesco or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, which is complained of herein.

54.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

55.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Tesco;

(c)    Whether the price of Tesco ADRs were artificially inflated during the Class Period; and

(d)    To what extent the members of the Class have sustained damages and the proper measure of damages.

56.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

57.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

58.    During the Class Period, Plaintiff and the Class purchased Tesco ADRs at artificially inflated prices and were damaged thereby.  When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## SCIENTER ALLEGATIONS

59.     Defendants acted with scienter because they: (i) knew the public statements issued or disseminated by Defendants in the name of the Company were materially false and misleading; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

60.     As set forth herein, Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Tesco, their control over, receipt, and/or modification of Tesco's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Tesco, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

61.     Tesco ADRs traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Tesco ADRs and the market information relating to Tesco, and have been damaged thereby.

62.     During the Class Period, the artificial inflation of Tesco ADRs was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Tesco's business, operations, and financial prospects.   These material misstatements and/or omissions created an unrealistically positive assessment of Tesco

and its business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times and, when disclosed, negatively affected the value of the Company stock.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices and being damaged as a result.

63.     At all relevant times, the market for Tesco ADRs securities was an efficient market for the following reasons, among others:

(a)     Tesco ADRs trade OTC with trading volume in the hundreds of thousands and millions of shares throughout the Class Period;

(b)     Tesco regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(c)     Tesco was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for Tesco ADRs promptly digested current information regarding Tesco from all publicly available sources and reflected such information in Tesco's stock price. Under these circumstances, all purchasers of Tesco securities during the Class Period suffered similar injury through their purchase of Tesco securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

41.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading and/or the forward-looking statement was authorized or approved by an executive officer of Tesco who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

42.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.     During the Class Period, the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Tesco ADRs at artificially inflated

prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Individual Defendants took the actions set forth herein.

44.     The Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Tesco ADRs in violation of §10(b) of the Exchange Act and Rule 10b-5.  The Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

45.     The Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Tesco's business, operations, and financial performance and prospects, as specified herein.

46.     The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Tesco's value, performance, and continued substantial growth.  These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Tesco and its business, operations, and financial prospects in light of the circumstances under which they were made, not misleading.  As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the

purchasers of the Company's securities during the Class Period. Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Individual Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Tesco's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Individual Defendants' misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

47.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Tesco ADRs was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Individual Defendants, but not disclosed in public statements by the Individual Defendants during the Class Period, Plaintiff and the other members of the Class acquired Tesco ADRs during the Class Period at artificially high prices and were damaged thereby.

48.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Tesco and its business and prospects, which was not disclosed by Individual Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Tesco ADRs, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

49.     By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

50.     As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

51.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     The Individual Defendants acted as controlling persons of Tesco within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff

contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

54.     As set forth above, Tesco and the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiff serving as a class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

    D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 23, 2014

                                   Respectfully Submitted,

                                   Joseph P. Guglielmo
                                   Donald A. Broggi
                                   Tom Laughlin
                                   **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
                                   The Chrysler Building
                                   405 Lexington Avenue, 40th Floor
                                   New York, NY 10174
                                   Telephone: 212-223-6444
                                   Facsimile: 212-223-6334
                                   jguglielmo@scott-scott.com
                                   dbroggi@scott-scott.com
                                   tlaughlin@scott-scott.com

                                   David R. Scott
                                   **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
                                   156 South Main Street
                                   P.O. Box 192
                                   Colchester, CT  06415
                                   Telephone:  (860) 537-5537
                                   Facsimile:  (860) 537-4432
                                   david.scott@scott-scott.com

                                   *Counsel for Plaintiff*