**KAHN SWICK & FOTI, LLC**
KIM E. MILLER (KM-6996)
BRUCE W. DONA (BD-3730)
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

-and-

LEWIS S. KAHN
J. RYAN LOPATKA
206 Covington St.
Madisonville, LA 70447
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Lead Counsel for Lead Plaintiff Stephen Klug
and the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ) | |
| ) | |
| ) | Case: 14 Civ. 8495-RMB |
| ) | |
| ) | HON. RICHARD M. BERMAN |
| IN RE TESCO PLC SECURITIES LITIGATION    ) | |
| ) | <u>Class Action</u> |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

HISTORY AND BACKGROUND OF THE CASE ........................................................ 5

ARGUMENT ................................................................................................................... 5

    I.    LEGAL STANDARDS ....................................................................................... 5

      A.    Awards of Attorneys' Fees under the PSLRA ......................................... 5

        i.    The PSLRA's Framework for the Selection of
            Lead Plaintiff and Lead Counsel ............................................... 5

        ii.    The Second Circuit and the PSLRA Support the Percentage of
            Recovery Approach for Awarding Fees in Common Fund Cases ......... 6

      B.    The Requested Fee Percentage is Reasonable Under the Percentage
          Method, A Lodestar Cross-Check, and the *Goldberger* Factors .............. 8

        i.    The Time and Labor Expended By Lead Counsel ..................................... 8

        ii.    The Magnitude and Complexities of the Litigation ................................ 11

        iii.    The Risk of the Litigation Supports the Requested Fee ......................... 15

        iv.    The Quality of Representation ................................................................. 18

        v.    The Requested Fee in Relation to the Settlement ................................... 19

        vi.    Public Policy Considerations Support the Requested Fee ...................... 21

      C.    The Class's Reaction to the Fee Request ................................................. 23

      D.    Lead Counsel's Request for Reimbursement of Expenses ...................... 24

    II.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abel v. Town Sports Int'l, LLC,*
    2012 U.S. Dist. LEXIS 183444 (S.D.N.Y. Dec. 18, 2012) ...................................... 6
*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
    677 F.3d 60 (2d Cir. 2012) ............................................................................................ 3
*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ...................................................................................................... 21
*Bateman Eichler, Hill Richards, Inc. v. Berner,*
    472 U.S. 299 (1985) ...................................................................................................... 21
*Blum v. Stenson,*
    465 U.S. 886 (1984) .................................................................................................... 6, 7
*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.,*
    954 F. Supp. 2d 276 (S.D.N.Y. 2013) ..................................................................... 4, 19
*Di Giacomo v. Plains All Am. Pipeline,*
    Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532 (S.D. Tex. Dec. 18, 2001) ........ 20
*Goldberger v. Integrated Res., Inc.,*
    209 F.3d 43 (2d Cir. 2000) ................................................................................... passim
*In re "Agent Orange" Prod. Liab. Litig.,*
    1985 U.S. Dist. LEXIS 23652 (E.D.N.Y. Jan. 7 1985) ............................................... 12
*In re Acclaim Entertainment, Inc., Secs. Litig.,*
    2007 U.S. Dist. LEXIS 98851 (E.D.N.Y. Oct. 2, 2007) ............................................. 19
*In re Am. Bank Note Holographics,*
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) ......................................................................... 15
*In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.,*
    2006 U.S. Dist. LEXIS 95437 (E.D. Pa. Nov. 21, 2008) .............................................. 4
*In re AOL Time Warner, Inc., Sec. & "ERISA" Litig.,*
    2006 U.S. Dist. LEXIS 17588 (S.D.N.Y. Apr. 6, 2006) .............................................. 11
*In re Apollo Group, Inc. Sec. Litig.,*
    2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) ............................................... 16
*In re Brown Co. Sec. Litig.,*
    355 F. Supp. 574 (S.D.N.Y. 1973) ............................................................................... 13
*In re Cardinal Health Inc. Sec. Litig.,*
    528 F. Supp. 2d 752 (S.D. Ohio 2007) .......................................................................... 6
*In re Cavanaugh,*
    306 F.3d 726 (9th Cir. 2002) .......................................................................................... 6
*In re Cendant Corp. Prides Litig.,*
    51 F. Supp. 2d 537 (D.N.J. 1999) ................................................................................ 20
*In re Cendant Corp. Sec. Litig.,*
    264 F.3d 201 (3d Cir. 2001) ........................................................................................... 5
*In re Citigroup Inc. Sec. Litig.,*
    965 F. Supp. 2d 369 (S.D.N.Y. 2013) ......................................................................... 20
*In re Copley Pharm., Inc.,*
    1 F. Supp. 2d 1407 (D. Wyo. 1998) ............................................................................... 7

*In re Elan Sec. Litig.*,
  385 F. Supp. 2d 363 (S.D.N.Y. 2005) ............................................................ 12
*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
  2007 U.S. Dist. LEXIS 57918 (S.D.N.Y. July 27, 2007) ................................. 20, 23
*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
  No. 02-CV-3400 (CM) (PED), 2010 U.S. Dist. LEXIS 119702 (S.D.N.Y. Nov. 5, 2010) ...... 23
*In re Fuqi Int'l, Inc. Sec. Litig.*,
  2016 U.S. Dist. LEXIS 20514 (S.D.N.Y. Feb. 19, 2016) .................................. 12, 19
*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................... 14, 24
*In re Hi-Crush Partners L.P. Sec. Litig.*,
  No. 12-Civ-8557, 2014 U.S. Dist. LEXIS 177175 (S.D.N.Y. Dec. 19, 2014) ....................... 19
*In re Ikon Office Solutions v. Stuart*,
  194 F.R.D. 166 (E.D. Pa. 2000) .................................................... 11, 20
*In re Indep. Energy Holdings PLC Sec. Litig.*,
  2003 U.S. Dist. LEXIS 17090 (S.D.N.Y. Sept. 29, 2003) ...................................... 16
*In re LaBranche Secs. Litig.*,
  Civ. No. 03-CV-8201, slip op. (S.D.N.Y. Jan. 22, 2009) ..................................... 19
*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  2009 U.S. Dist. LEXIS 120953 (S.D.N.Y. Dec. 23, 2009) ..................................... 7
*In re Merrill Lynch Tyco Research Sec. Litig.*,
  249 F.R.D. 124 (S.D.N.Y. 2008) .................................................... 18, 21
*In re NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................... 18
*In re PaineWebber Ltd. P'Ships Litig.*,
  2003 U.S. Dist. LEXIS 13377 (S.D.N.Y. Aug. 4, 2003) ....................................... 10
*In re Prudential Sec. Ltd. P'ships Litig.*,
  985 F. Supp. 410 (S.D.N.Y. 1997) ....................................................... 15
*In re Rite Aid Corp. Sec. Litig.*,
  362 F. Supp. 2d 587 (E.D. Pa. 2005) ..................................................... 20
*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2006) ....................................................... 7, 8, 23
*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  461 F. Supp. 2d 383 (D. Md. 2006) ....................................................... 7
*In re Smith Barney Transfer Agent Litig.*,
  2011 U.S. Dist. LEXIS 144351 (S.D.N.Y. Dec. 15, 2011) ..................................... 6
*In re Société Générale Securities Litigation ("SocGen")*,
  No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ........................ 3, 13
*In re Telectronics Pacing Sys. Accufix Atrial "J" Lead Products Litig.*,
  137 F. Supp. 2d 985 (S.D. Ohio 2001) .................................................... 11
*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) ................................................. 7, 14
*In re Veeco Instruments Secs. Litig.*,
  2007 U.S. Dist. LEXIS 85554 (S.D.N.Y. Nov. 7, 2007) ...................................... 11
*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) ..................................................... 21

*In re Xcel Energy, Inc., Sec, Derivative & "ERISA" Litig.,*
   364 F. Supp. 2d 980 (D. Minn. 2005)......................................................... 20
*Maley v. Del Global Techs. Corp.,*
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ............................... 11, 18, 19, 20
*Morrison v. Nat'l Austl. Bank Ltd.,*
   561 U.S. 247 (2010)......................................................................... 3, 13
*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,*
   763 F.3d 198 (2d Cir. 2014) ............................................................. 3, 13
*Ressler v. Jacobson,*
   149 F.R.D. 651 (M.D. Fla. 1992) ........................................................ 22
*Robbins v. Koger Props.,*
   116 F.3d 1441 (11th Cir. 1997) .......................................................... 16
Roberts v. Texaco, Inc.,
   979 F. Supp. 185 (S.D.N.Y. 1997) ..................................................... 20
*Strougo v. Bassini,*
   258 F. Supp. 2d 254 (S.D.N.Y. 2003) ............................................... 14
*Taft v. Ackermans,*
   2007 U.S. Dist. LEXIS 9144 (S.D.N.Y. Jan. 31, 2007) ................. 19, 21
*Teachers' Ret. Sys. v. A.C.L.N., Ltd.,*
   2004 U.S. LEXIS 8608 (S.D.N.Y. 2004) ......................................... 15, 24
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007).............................................................................. 21
*Van Horn v. Trickey,*
   840 F.2d 604, 607 (8th Cir. 1987) ...................................................... 17
*Wal-mart Stores Inc. v. U.S.A. Inc.,*
   396 F.3d 96 (2d Cir. 2005) ................................................................... 7

## Statutes

15 U.S. C. § 78u-4(a) ......................................................................... 5, 6

## Other Authorities

Dr. Renzo Comolli & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation:*
   *2015 Full-Year Review*, NERA Economic Consulting (2016) ............................................ 1, 17
H.R. Conf. Rep. No. 104-369 (1995).................................................................................... 5
Kevin LaCroix, *Tesco Securities Suit: Applicability of U.S. Securities Laws to Unlisted ADRS?*,
   THE D&O DIARY (Oct. 4, 2015) ........................................................................................ 13
Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action*
   *Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 245 (2010) ............................................ 19

Lead Counsel Kahn Swick & Foti, LLC ("Lead Counsel"), with the approval of the Court-appointed Lead Plaintiff Stephen Klug ("Plaintiff"), respectfully submits this memorandum in support of its motion for an award of attorneys' fees and for reimbursement of litigation expenses. In consideration of Lead Counsel's efforts, and the recovery obtained for the Class in light of the significant risks discussed herein, Lead Counsel respectfully moves the Court for: (i) an award of attorneys' fees in the amount of 20% of the Settlement Fund; and (ii) reimbursement of expenses reasonably and necessarily incurred by Lead Counsel in prosecuting and resolving the Action in the amount of $123,935.44, plus interest.

## PRELIMINARY STATEMENT

The Settlement, which provides for payment of $12,000,000 to the Class, a recovery of approximately 25% of the maximum recoverable damages (approximately $48.1 million, as determined by Plaintiff's damages consultants) is an exceptional result for the Class. With the median ratio of settlements to investor losses at only 1.6% in 2015 for securities class actions, this Settlement represents a recovery over 15 times greater than the average in similar cases.[1] This recovery would not have been possible without the skill, diligence and advocacy of Lead Counsel, who devoted much of its time and effort to the investigation, vigorous prosecution, and settlement of this Action on a wholly contingent basis.[2]

As more fully described *infra* and in the accompanying Miller Declaration, the Settlement was reached only after Lead Counsel:

- briefed and successfully argued Plaintiff's Motion to be Appointed Lead Plaintiff and to Approve Lead Plaintiff's Choice of Counsel;

---

[1] Dr. Renzo Comolli & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2015 Full-Year Review*, NERA Economic Consulting (2016).

[2] *See generally* Declaration of Kim E. Miller ("Miller Decl.") filed along with this motion and Lead Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds ("Final Approval Motion").

- extensively investigated the underlying facts with the assistance of private investigators and an accounting consultant and filed an amended complaint;

- drafted and filed the 92-page amended complaint on May 6, 2015;

- undertook further investigation with additional former employees of the Company and prepared the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint");

- thoroughly researched and opposed Defendants' motion to dismiss;

- submitted mediation briefs and engaged in a formal mediation facilitated by former U.S. District Judge Layn R. Phillips at which the parties reached an agreement in principal to settle the litigation as to all Defendants and all claims;

- thoroughly reviewed and analyzed a substantial volume of discovery materials provided by Defendants which confirmed the fairness, reasonableness, and adequacy of the settlement;

- prepared and filed the motion for preliminary approval and stipulation of settlement, which was approved by this Court on December 23, 2015;

- oversaw the settlement administration process, including, *inter alia*, all aspects of notice and claims submission.

The Settlement was reached at a time when Lead Counsel had a strong understanding of the strengths and weaknesses of the case, the risks of continued litigation, and the propriety of settlement.

In light of the considerable risks presented in this litigation, the Settlement is a significant recovery for the Class. As in any complex litigation of this type, Plaintiff faced various significant obstacles in proving both liability and damages, and certifying the Class. For example, among other things, Defendants have argued that the Complaint does not allege actionable misstatements or omissions, nor does it allege sufficient particularized facts giving rise to the requisite strong inference that each of the Defendants acted with scienter. *See* D.E. 76 at 31. In addition to these usual hurdles to securities litigation claims, Plaintiff also faced novel

legal arguments related to the American Depositary Share (ADR) and F-share investments at issue in this case. Specifically, Defendants argued that the purchases of Tesco ADRs were predominantly foreign transactions, which render Plaintiff's claims outside the territorial reach of Section 10(b) under the Supreme Court's ruling in *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). Although Lead Counsel argues that the purchases of ADRs are domestic transactions to which Section 10(b) does apply, Plaintiff was faced with this Court's opinion in *In re Société Générale Securities Litigation ("SocGen")*, No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010), which supports Defendants' position.  To prevail, Plaintiff would have needed to persuade the Court to reject the arguments of defense counsel—who notably briefed and argued the case for the respondents in *Morrison v. National Australia Bank*—and hold that recent Second Circuit opinions in *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014) and *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) changed the landscape of the law on this issue and compelled a different result than when the Court decided *SocGen*. Furthermore, Defendants also argued that England is the more appropriate and convenient forum under the doctrine of *forum non conveniens*, and that this Court has no personal jurisdiction over the Individual Defendants. Regardless of Lead Counsel's confidence in victory before the ultimate trier of fact, Defendants' success on any of these arguments would have resulted in *zero* recovery for the Class.

Lead Counsel, who is extremely experienced in the prosecution of federal securities class actions, respectfully submits that the Settlement is a testament to its hard work and the quality of legal representation. Given the recovery obtained, the amount and complexity of the work involved during the pendency of the litigation, the skill and expertise required to prosecute and resolve the claims asserted, and the substantial risks that Lead Counsel undertook in this Action,

Lead Counsel respectfully submits that the 20% fee request – well below the 25% "benchmark" fee award commonly used in the Second Circuit – is fair and reasonable. *See City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276 (S.D.N.Y. 2013) (citing *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 51-52 (2d Cir. 2000)). This fee request was not only reduced by Lead Counsel from its retainer agreement with Plaintiff, which allowed for attorneys' fees of up to 33 1/3%, it was further reduced from the 30% maximum fee request indicated in the Notice of Pendency sent to Class Members, and also represents a modest 2.13 multiplier of the total lodestar value of the time that Lead Counsel dedicated to this Action. Furthermore, Lead Counsel submits that the request of reimbursement of expenses in the amount of $123,935.44 is fair and reasonable and warrants approval from the Court.

Notably, following dissemination of over 100,000 Notice packets that indicate that Lead Counsel will submit a request for attorneys' fees of up to 30% of the Net Settlement Fund and reimbursement of expenses of up to $200,000 (well above the actually-incurred expenses of $123,935.44) to date, not a single objection has been filed challenging Lead Counsel's fee and reimbursement request. Although the April 5, 2016 deadline to object to any aspect of the Settlement, including the request for fees and expenses, has not yet passed, Class Members' lack of objection supports Lead Counsel's fee and expenses request, which is well under the request indicated in the Notice documents.

Lead Counsel recognizes that, despite its efforts and achievements on behalf of the Class, "[i]t is important to avoid awarding 'windfall fees' and any appearance of having done so for the integrity of the judicial system, legal profession and Rule 23." *In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.*, 2006 U.S. Dist. LEXIS 95437, at *36 (E.D. Pa. Nov. 21, 2008). Furthermore, Lead Counsel appreciates that the "Court has an 'independent obligation to ensure the

reasonableness of any fee request," *In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 281-82 (3d Cir. 2001), and that this Court takes this obligation seriously. As set forth herein, Lead Counsel respectfully submits that its fee request of 20% of the $12,000,000 recovery is eminently reasonable, especially in light of the unique legal obstacles presented and significant result achieved in this case. *See* 15 U.S.C. § 78u-4(a)(6).

## HISTORY AND BACKGROUND OF THE CASE

Lead Counsel respectfully refers the Court to the accompanying Declaration of Kim E. Miller in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Lead Plaintiff's Motion for Award of Attorneys' Fees and Expenses (the "Miller Decl."), incorporated herein by reference, for a more detailed history of the litigation and the factors bearing on the reasonableness of the Settlement, Plan of Allocation, Award of attorneys' fees and expenses.

## ARGUMENT

I.   **LEGAL STANDARDS**

   A.  **Awards of Attorneys' Fees Under the PSLRA**

      i.   **The PSLRA's Framework for the Selection of Lead Plaintiff and Lead Counsel**

The Private Securities Litigation Reform Act of 1995 ("PSLRA") created certain mechanisms to "ensure the protection of class members' interests in securities litigation." H.R. Conf. Rep. No. 104-369, at 34 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 733. "In contrast to the usual method of naming lead counsel the first attorney to file suit, the PSLRA scheme allows the lead plaintiff to vet and select lead counsel from a pool of qualified attorneys, which should better assure the Court that 'counsel selection and retention were done in the bests interests of the class.'" *Id.* (quoting *Cendant Corp.*, 264 F.3d at 282). *See also In re Smith Barney Transfer*

*Agent Litig.*, 2011 U.S. Dist. LEXIS 144351, at *12 (S.D.N.Y. Dec. 15, 2011); *In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002). Indeed, the lead plaintiff has a duty under the PSLRA to "select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v).

Because of the protections "embedded [for the class] in the PSLRA…courts 'should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and properly-selected lead counsel.'" *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 758 (S.D. Ohio 2007). Here, Plaintiff and Lead Counsel negotiated and entered into a retainer agreement for the benefit of the Class authorizing Lead Counsel to request up to 33.33% of the recovery as attorneys' fees. The present 20% fee request is substantially less than the percentage negotiated *ex ante* with Plaintiff, further reflecting the reasonableness of Lead Counsel's requested fee. *See* Miller Decl. at ¶ 82.

### ii. The Second Circuit and the PSLRA Support the Percentage of Recovery Approach for Awarding Fees in Common Fund Cases

The party seeking attorneys' fees "bears the burden of demonstrating that its requested fees are reasonable." *Abel v. Town Sports Int'l, LLC*, 2012 U.S. Dist. LEXIS 183444, at *88 (S.D.N.Y. Dec. 18, 2012) (citing *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). There are two common methods in which courts determine whether a fee is reasonable. In the percentage method, the "court sets some percentage of the recovery as a fee." *Goldberger*, 209 F.3d at 47. An alternative method of fee calculation is the lodestar method, under which "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate." *Id*.

The percentage method is also supported by, and indeed codified by, the PSLRA. *See* 15 U.S.C. § 78u-4(a)(6). By its own language, the "PSLRA limits any award of attorneys' fees and

expenses to a 'reasonable percentage' of any recovery." *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 385 (D. Md. 2006). Thus, under the PSLRA, courts have held that "Congress plainly contemplated that percentage-of-recovery would be the primary measure of attorneys' fees awards in federal securities class actions." *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 586 (S.D.N.Y. 2008); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2006).

Although district courts retain discretion over whether to apply the percentage-of-recovery approach or the lodestar method in determining attorneys' fees, the prevailing standard in this Circuit, and for common fund cases generally, is the percentage method. *See Blum*, 465 U.S. at 903 n.16. (noting that in common fund cases, "a reasonable fee is based on a percentage of the fund bestowed on the class"); *Wal-mart Stores Inc. v. U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (noting that "[t]he trend in this Circuit is toward the percentage method, which 'directly aligns the interest of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'") (citations omitted). The lodestar method, on the other hand, "tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Id. See also In re Copley Pharm., Inc.*, 1 F. Supp. 2d 1407, 1411 (D. Wyo. 1998) ("Simply put, it is much easier and far less demanding of scarce judicial resources to calculate a percentage of the fund fee than to review hourly billing practices over a long, complex litigation."). As a result, "[t]he Second Circuit encourages using the lodestar method only as a cross-check for the percentage method." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 120953, at *43 (S.D.N.Y. Dec. 23, 2009) (citing *Goldberger*, 209 F.3d at 50).

Consistent with the prevailing trend in the Second Circuit, Lead Counsel requests that the

Court award attorneys' fees based on a reasonable percentage of the fund.

### B.  The Requested Fee Percentage Is Reasonable Under the Percentage Method, a Lodestar Cross-Check, and the *Goldberger* Factors

"[N]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'" *Goldberger*, 209 F.3d at 50 (citation omitted). The *Goldberger* factors "need not be applied in a formulaic way" because each case is different and "in certain cases, one factor may outweigh the rest." *Rite Aid*, 396 F.3d at 301. Lead Counsel respectfully submits that an analysis of the foregoing *Goldberger* factors, as well as an analysis under the percentage-of-recovery and lodestar methods, demonstrates that the present fee and expense request is reasonable and appropriate and should be approved by the Court.

### i.  The Time and Labor Expended By Lead Counsel

A review of the time and effort expended by Lead Counsel establishes that the requested fee is justified. Lead Counsel has devoted a significant amount of time and resources to the research, investigation and prosecution of this Action, resulting in an excellent recovery for the Class without the substantial expense, risk and delay of continued litigation. This Settlement was reached at a point when Lead Counsel had committed extensive resources to understanding the facts and challenges posed by the claims and defenses that could impact any recovery for the Class.

Lead Counsel has spent over 1,840.9 hours researching, investigating, and prosecuting this case on behalf of the Class for an aggregate lodestar of approximately $1,127,995.50, and have incurred $123,935.44 in expenses. During the course of this Action, as explained in more

detail in the Miller Declaration, Lead Counsel: (a) researched the facts and claims that formed the basis of the initial complaint; (b) extensively researched, briefed, and successfully argued Plaintiff's Motion to be Appointed Lead Plaintiff and to Approve Lead Plaintiff's Choice of Counsel[3]; (c) conducted an extensive investigation into the underlying facts, including the retention of private investigators in the United States and the United Kingdom, the retention of an accounting consultant to review and analyze years of Tesco financial reports, interviews of numerous persons with knowledge of the allegations, including former employees of Tesco, as well as third parties, consultation with experts on the issues of damages and market efficiency, a thorough review of the Company's annual reports, press releases, and financial statements and thorough review of myriad news articles and analyst reports; (d) thoroughly researched the law pertinent to the Class members' claims and the Defendants' defenses, including novel jurisdictional issues related to the over-the-counter ("OTC") domestic purchases of Tesco ADRs and F-Shares; (e) drafted and filed the amended complaint on May 6, 2015; (f) undertook further investigation with additional former employees of the Company; (g) prepared the Complaint, which contains the additional allegations from its ongoing investigation; (h) vigorously opposed Defendants' motion to dismiss; (i) worked with economists and causation and damages consultants; (j) engaged in informal settlement negotiations; (k) submitted mediation briefs and answered questions from Judge Phillips in advance of the mediation; and (l) engaged in a formal

---

[3] At the lead plaintiff appointment stage, only Lead Counsel contested the appointment of a lead plaintiff movant, a Fund with purportedly higher losses, on the grounds of inadequacy or atypicality based on a review of the fund's trade data, which included discrepancies involving trading prices and trading volumes that fell outside of the range of OTC market prices and trading volumes. The Court noted in its order that Lead Counsel "argue[d] persuasively that National Pension Fund's 'losses are inaccurate.'" D.E. 54 at 6. The diligence of Lead Counsel in finding, and persuasively arguing, that the Fund should not be appointed and that Mr. Klug should be appointed instead, eliminated the potential adequacy and typicality risks to the putative class stemming from those trading discrepancies.

mediation facilitated by Judge Phillips where the parties presented their positions to the other side; (m) reached an agreement in principal to settle the litigation as to All Defendants and all claims; (n) thoroughly reviewed and analyzed a substantial volume of discovery materials provided by Defendants which confirmed the fairness, reasonableness, and adequacy of the settlement; (o) sought and evaluated competitive bids from multiple claims administrators for administration of this Settlement; (p) prepared and filed the motion for preliminary approval and stipulation of settlement, which was approved by this Court on December 23, 2015; (q) prepared and oversaw the publication of the Summary Notice of Pendency of Class Action in the *Investor's Business Daily* and over the *PR Newswire* on January 12, 2016, and twice in the International Edition of *The Financial Times* on January 12 and 13, 2016; and (r) oversaw the settlement administration process, including, *inter alia*, mailing of the Notice and Claim Form, supplying the Notice and Claim Form to the Class, notifying brokerage firms or other nominee accounts of the appropriate manner to provide individual notice to Class members, tracking requests for exclusion, and assisting shareholders with questions regarding the criteria for recovery and the procedure for filing claims.

The work performed by Lead Counsel was divided between partners, associates, and paralegals. As demonstrated by the lodestar table attached to the Miller Declaration, the laboring oar was carried by junior members of the firm, and therefore the majority of Lead Counsel's lodestar is attributable to associates with lower billing rates.  Moreover, Lead Counsel has reduced rates for attorney travel time in accordance with customary practice within this District, *see In re PaineWebber Ltd. P'Ships Litig.*, 2003 U.S. Dist. LEXIS 13377, at *14 (S.D.N.Y. Aug. 4, 2003) ("when determining attorneys' fees, courts in the Southern District of New York…customarily reduce the amount awarded for travel to at least 50% of that rate"), and also

excluded any attorney time related to Lead Counsel's request for fees and reimbursement of expenses. *See* Miller Decl. at ¶ 79, n.6. Thus, Lead Counsel submits that because the time spent on this case accurately reflects the work performed, tasks were appropriately delegated, and billing rates were reasonable and appropriately discounted, the first *Goldberger* factor supports Lead Counsel's fee request.

### ii. The Magnitude and Complexities of the Litigation

Consideration of the second *Goldberger* factor reveals that the magnitude and particular legal complexities of this securities class action support Lead Counsel's fee request. "Most class actions are inherently complex and settlement avoids the costs, delays, and a multitude of other problems associated with them." *In re Telectronics Pacing Sys. Accufix Atrial "J" Lead Products Litig.,* 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001) (citation omitted). Courts within this Circuit have found securities actions particularly complex within the class action arena. *See In re Veeco Instruments Secs. Litig.,* 2007 U.S. Dist. LEXIS 85554, at *18 (S.D.N.Y. Nov. 7, 2007) ("A securities case, "by its very nature, is a complex animal.") (quoting *Maley v. Del Global Techs. Corp.,* 186 F. Supp. 2d 358, 372 (S.D.N.Y. 2002)). Furthermore, courts have noted that "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *In re Ikon Office Solutions v. Stuart,* 194 F.R.D. 166, 194 (E.D. Pa. 2000). *See also In re AOL Time Warner, Inc., Sec. & "ERISA" Litig.,* 2006 U.S. Dist. LEXIS 17588, at *33 (S.D.N.Y. Apr. 6, 2006) ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages. These challenges are exacerbated…where a number of controlling decisions have recently shed new light on the standard for loss causation.").

Although securities fraud class actions are generally seen as complicated cases that require the participation of highly skilled and specialized attorneys, this case involved particularly complex and unique issues of fact and law that more than justify the requested fee under *Goldberger*. *See In re "Agent Orange" Prod. Liab. Litig.*, 1985 U.S. Dist. LEXIS 23652, at *43 (E.D.N.Y. Jan. 7 1985) ("The more novel and complex the issues, the greater the risk of litigation"); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005) (Berman, J.) (acknowledging that higher fees may be appropriate in cases where "the factual and legal issues were [] exceptionally 'novel.'").

On the one hand, the facts of this case required Lead Counsel to investigate and analyze Tesco's accounting treatment and supplier practices during the Class Period using foreign accounting standards and principles, not the more familiar Generally Accepted Accounting Principles (GAAP). *See In re Fuqi Int'l, Inc. Sec. Litig.*, 2016 U.S. Dist. LEXIS 20514 (S.D.N.Y. Feb. 19, 2016) (approving 33 1/3% of common fund as fee award, noting "[h]ere, the securities claims advanced by Plaintiffs involved numerous complex factual issues relating to accounting, which were complicated by language issues and accounting procedures in the [People's Republic of China] that differed from those in this country."). One of Lead Counsel's attorneys, who is also a Certified Public Accountant, performed a high-level review of Tesco's internal accounting practices and accounting principles regarding the recognition of promotional revenue.  As more detailed analysis became necessary, Lead Counsel hired an external accounting consultant to perform a detailed analysis of, among other things, Tesco's recognition of commercial income during the Class Period.

Even more unique than the factual allegations, however, were the novel legal hurdles Plaintiff faced in this litigation. In addition to the ordinary legal challenges presented in

securities fraud cases mentioned above, Defendants raised several jurisdictional defenses that, if successful, would have been grounds for dismissal. Most notably, Defendants argued that the Plaintiff's purchase of Tesco ADRs was a predominantly foreign transaction, and therefore his claims were outside the territorial reach of Section 10(b) of the Exchange Act under the Supreme Court's ruling in *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). Although Lead Counsel argues that the purchases of ADRs are domestic transactions to which Section 10(b) does apply, the Court's determination of this issue would turn on its interpretation of recent Second Circuit opinions in *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014) and *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), and whether these opinions required a different result than the Court's own opinion in *In re Société Générale Securities Litigation*, No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010), which ruled against plaintiffs on this very issue. Moreover, in addition to arguing that the ADR transactions are predominantly English, Defendants have also argued that England is the more appropriate and convenient forum under the doctrine of *forum non conveniens*, and that this Court has no personal jurisdiction over the Individual Defendants. Lead Counsel is confident in Plaintiff's position refuting these arguments; however, the outcome of these issues is far from certain.[4]

Even if Plaintiff survived Defendants' motion to dismiss, absent the Settlement, the litigation would have been expensive and time consuming, as Defendants would have vigorously opposed Plaintiff's motion for class certification and undoubtedly filed a motion for summary

---

[4] *See* Kevin LaCroix, *Tesco Securities Suit: Applicability of U.S. Securities Laws to Unlisted ADRS?*, THE D&O DIARY (Oct. 4, 2015), available at http://www.dandodiary.com/2015/10/articles/secuirites-litigation/tesco-securities-suit-applicability-of-u-s-securities-laws-to-unlisted-adrs/.

judgment.[5] Briefing and discovery—including expert discovery—to resolve those motions would have entailed further substantial time and effort. Further assuming that Plaintiff survived Defendants' motion for summary judgment, and assuming a class was certified, trial preparation would have required many additional hours of work at great expense. The trial in this case would be very complicated for jurors given the complex accounting issues and legal issues regarding loss causation and damages, and would have been very expensive for the Class. The trial of liability issues alone would have involved substantial attorney and expert time, the introduction of voluminous documentary and deposition evidence, vigorously contested motions, and the considerable expenditures of judicial resources. The standard costs of litigation—for example, copying, traveling, depositions, computer services—are great, but here, these costs are even greater where several depositions would likely have occurred in England.[6] Moreover, "even if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation…the passage of time would introduce yet more risks…and would, in light of the time value of money, make future recoveries less valuable than this current recovery." *Strougo v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003).

Taken together, the foregoing factors regarding the magnitude and complexity of this securities class action support the conclusion that the requested fee is reasonable and fair.

### iii. The Risk of the Litigation Supports the Requested Fee

The Second Circuit "has identified the risk of success as perhaps the foremost factor to be considered in determining" reasonable attorneys' fees. *In re Global Crossing Sec. & ERISA*

---

[5] Even to this point, this Action was vigorously contested, and Defendants were represented by very experienced and qualified counsel. *See In re Brown Co. Sec. Litig.*, 355 F. Supp. 574, 592-93 (S.D.N.Y. 1973) (standing of opposing counsel underscores complexity of litigation and challenges faced by class counsel).

[6] The ability to compel deponents living abroad to testify in this Action presented its own risks to Lead Counsel's ability to obtain evidence.

*Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004). *See also In re Telik*, 576 F. Supp. At 592 ("Courts have repeatedly recognized 'that the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award plaintiffs' counsel in class actions."). Courts in this Circuit have long recognized that the risk associated with a case bears heavily upon the determination of an appropriate fee award. *See In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 432-33 (S.D.N.Y. 2001) ("[It is] appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award."). The risk of non-payment is especially high in class actions with contingent fee arrangements, like here. *See Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, 2004 U.S. LEXIS 8608 (S.D.N.Y. 2004) ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation."); *In re Prudential Sec. Ltd. P'ships Litig.*, 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award.").

From the beginning, Lead Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to assure that sufficient attorney and para-professional resources were dedicated to the prosecution of the Action and that funds were available to compensate staff, investigators and consultants, and to pay for the considerable out-of-pocket costs which a case such as this entails. *See* Miller Decl. at ¶ 88. Because of the nature of a contingent practice whose cases are predominantly complex, lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation. Under these circumstances, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. *Id.*

In addition to advancing litigation expenses, Lead Counsel faced the possibility that it would receive no attorneys' fees in the event that Defendants succeeded at any one of many possible junctures in the litigation. To begin, Defendants made numerous arguments in their motion to dismiss that would have ended the case if adjudicated in their favor. In addition to the extraterritoriality and jurisdictional arguments discussed above, Defendants also argued that the Complaint fails to allege sufficient particularized facts giving rise to the requisite strong inference that each of the Defendants acted with scienter. More specifically, Defendants argued that there were no allegations of any motive to commit fraud, nor any suspicious insider sales by any of the Defendants; that Plaintiff pled no specific facts suggesting that any Defendant actively engaged in any wrongdoing, conscious misbehavior or recklessness; that the confidential witness allegations do not support the Complaint's allegations; and that the Complaint fails to plead corporate scienter as to Tesco. Although Lead Counsel is confident in the Complaint's allegations, many 10(b) actions are dismissed on the basis of failure to adequately plead scienter. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 2003 U.S. Dist. LEXIS 17090, at *11 (S.D.N.Y. Sept. 29, 2003) (noting difficulty of proving scienter).

Moreover, while Lead Counsel believes that Plaintiff's claims would be borne out by the evidence during discovery, there are additional legal hurdles that would arise at class certification and summary judgment, which present further risks against recovery. For example, Defendants would have maintained that the decline in price of Tesco's ADRs and F-Shares and any losses incurred by Plaintiff and Class Members were caused by other factors, and not by any alleged misstatements or omissions from any public statement made by Defendants.[7] To that end,

---

[7] Many securities cases that have survived motion to dismiss have later been defeated on loss causation grounds. *See, e.g.*, *In re Apollo Group, Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) (on a motion for judgment as a matter of law, court overturned a jury

Defendants would undoubtedly argue, as they fervently did during the mediation, that damages were severely limited, if not eliminated. In order for the Class to recover damages at the level estimated by Plaintiff's expert, Plaintiff would need to prevail on each and every one of the claims alleged, and for the entire Class. Notwithstanding this fact, the jury would also have to adopt Plaintiff's expert's damages analysis over Defendants' expert's analysis, and such expert battles are never predictable. Thus, even if Plaintiff prevailed as to liability at trial, the judgment could possibly reflect only a fraction of the damages claimed. And even that judgment would not be certain, as an inevitable appeal presents an additional risk as well as delay of any monetary benefit to the Class. Despite these risks, Lead Counsel obtained a substantial settlement of 25% of Plaintiff's expert's total calculation of damages, which is an amount over 15 times greater than the average recovery in securities class actions.[8] Acknowledging both the risks involved in this litigation and the "noteworthy" fact that "the Class will receive a percentage of losses higher than that typically received in this type of class action" the mediator endorses Lead Counsel's fee request.  *See* Declaration of Layn R. Phillips in Support of Settlement, attached as Exhibit 1 to the Miller Decl., at ¶¶14-15.

Lead Counsel respectfully submits that the significant risks of surviving Defendants' motion to dismiss and establishing liability and damages support the award of attorneys' fees.

### iv.    The Quality of Representation

---

verdict of $277 million based on insufficient evidence of loss causation); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) ($81 million jury verdict reversed on appeal on loss causation grounds).

[8] Dr. Renzo Comolli & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2015 Full-Year Review*, NERA Economic Consulting (2016) ("[T]he median ratio of settlements to investor losses was 1.9% in 2014.  For the latter half of the year, after the *Halliburton II* decision, the median ratio was only 1.4%, suggesting that cases settled for less. This trend appears to have continued in 2015. The overall ratio was 1.6% in 2015, the second lowest percent in a decade, and coincided with a substantial decrease in median investor losses."

In evaluating the fourth *Goldberger* factor, the "quality of representation," courts in the Second Circuit "review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008). Lead Counsel practices extensively in complex federal civil litigation, particularly the litigation of securities class actions, and has successfully litigated these types of actions in courts throughout the country. *See* Miller Decl. at ¶ 85. To achieve a $12,000,000 settlement in this Action, despite Defendants' strong arsenal of arguments at motion to dismiss, summary judgment, class certification and trial, took a great deal of legal acumen and negotiating skill. Here, Defendant Tesco was represented by Wachtell, Lipton, Rosen & Katz, an exceptionally skilled firm with a reputation for vigorous advocacy in the defense of complex civil cases, particularly securities class actions. *See Maley*, 186 F. Supp. 2d at 373 (noting that the quality and vigor of opposing counsel is also a significant consideration when determining the quality of services provided by plaintiffs' counsel); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 488 (S.D.N.Y. 1998) (same). Notably, the lead partner on the case for Defendant Tesco, George T. Conway III, briefed and argued the case for respondents in *Morrison v. National Australia Bank*, in which the Supreme Court held that Section 10(b) does not apply extraterritorially to claims of "foreign cubed" plaintiffs. Thus, not only was Lead Counsel faced with opposing counsel from an all-star team of sophisticated and experienced defense counsel, but also with perhaps the single-most preeminent attorney on the issue of extraterritoriality of Section 10(b).

This Settlement represents a highly favorable result for the Class, one that is attributable to the diligence, determination, hard work and reputation of Lead Counsel, who developed, litigated and successfully negotiated the settlement of this action across from a highly skilled and

determined defense team. Accordingly, the quality of representation factor weighs heavily in favor of supporting Lead Counsel's fee request.

### v.    The Requested Fee in Relation to the Settlement

The fee requested in this case—20% of the proposed Settlement Fund—is reasonable and falls in line with (and indeed, well under) fee awards in comparable actions in this Circuit. *See, e.g.*, *In re Fuqi Int'l, Inc. Sec. Litig.*, 2016 U.S. Dist. LEXIS 20514, at *28 (S.D.N.Y. Feb. 19, 2016) (approving attorneys' fees of 33% of $7.5 million settlement fund in securities litigation prior to motion to dismiss); *Maley*, 186 F. Supp. 2d at 369 (approving 33 1/3% of $11.5 million securities fraud class action settlement while motions to dismiss pending); *In re Acclaim Entertainment, Inc., Secs. Litig.*, 2007 U.S. Dist. LEXIS 98851, at *16 (E.D.N.Y. Oct. 2, 2007) (holding that attorneys' fees request of 30% of $13,650,000 settlement fund "is consistent with awards in similarly complex cases in this jurisdiction"); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-Civ-8557, 2014 U.S. Dist. LEXIS 177175, at *33-34, 46 (S.D.N.Y. Dec. 19, 2014) ("the 33 1/3% fee requested by Lead Counsel in this Action is consistent with percentage fees awarded in this Circuit and nationwide."); *Taft v. Ackermans*, 2007 U.S. Dist. LEXIS 9144 (S.D.N.Y. Jan. 31, 2007) (30% of fee award of $15.175 million settlement fund of cash and stock); *In re LaBranche Secs. Litig.*, Civ. No. 03-CV-8201, slip op. (S.D.N.Y. Jan. 22, 2009) (30% fee awarded in $13 million settlement). The 20% requested fee is indeed under Second Circuit's "increasingly used benchmark of 25%." *City of Pontiac*, 954 F. Supp. 2d at 281 (citing *Goldberger*, 209 F.3d at 51-52). *See also* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 245, 262 (2010) (reporting a mean fee-to-recovery ratio on securities class actions of 23% and a median of 25%).

A lodestar cross-check confirms the reasonableness of the requested attorneys' fee. Under Lead Counsel's applicable billable rates at 1,840.9 total hours, the requested $2,400,000 attorney fee represents a lodestar multiplier of just 2.13. A 2.13 lodestar multiplier is well within the range commonly approved by district courts in this Circuit. *See, e.g.*, *Maley*, 186 F. Supp. 2d at 369 (noting that 33 1/3% of $11.5 million settlement "will amount to a multiplier of 4.65, well within the range awarded by courts in this Circuit and courts throughout the country."); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 374 (S.D.N.Y. 2013) (approving 2.8 lodestar multiplier); *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 57918, at *54 (S.D.N.Y. July 27, 2007) (holding that lodestar multiplier of 2.48 "is within the range found to be reasonable by courts that have used lodestar cross checks in complex class actions with outstanding results in the fact of substantial risks) (citing *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005)) (multiplier of 6.96); *In re Xcel Energy, Inc., Sec, Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980 (D. Minn. 2005) (multiplier of 4.7); *In re Cendant Corp. Prides Litig.*, 51 F. Supp. 2d 537 (D.N.J. 1999), *vacated and remanded,* 243 F.3d 722 (3d Cir.2001), *on remand,* No. 98-2819 (D.N.J. June 11, 2002) (multiplier of 5.28); *Di Giacomo v. Plains All Am. Pipeline*, Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532 (S.D. Tex. Dec. 18, 2001) (multiplier of 5.3); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5).

The lodestar/multiplier analysis is to be used merely as a cross-check on reasonableness, and should not form the starting point of the Court's review. Otherwise, the Court's approach would undermine the principles supporting the percentage approach and encourage litigants to needlessly build lodestar and potentially discourage timely, yet meaningful settlements. *See Ikon*, 194 F.R.D. at 196 ("The court will not reduce the requested award simply for the sake of doing

so when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent.").

Accordingly, the requested fee of only 20% of the Settlement fund at a lodestar multiplier of 2.13 is supported by other cases within this Circuit and elsewhere.

### vi.    Public Policy Considerations Support the Requested Fee

Lead Counsel respectfully submits that public policy considerations—the sixth and final *Goldberger* factor—support Lead Counsel's fee request of 20% of the $12,000,000 Settlement Fund. *See Goldberger*, 209 F. 3d at 50. Courts in the Second Circuit have held that "[p]ublic policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *In re Merrill Lynch*, 249 F.R.D. at 141-42. "In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005).

The federal securities laws are remedial in nature, and, to effectuate their purpose of protecting investors, courts must encourage private lawsuits. *See Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988). The Supreme Court has emphasized that private securities actions such as this provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (citation omitted). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (noting that the court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions). Plaintiffs' counsel in these types of cases are typically retained on a contingent basis, largely due to the huge commitment of time and expense

required. The typical class representative is unlikely to be able to pursue long and protracted litigation at his or her own expense, particularly with the knowledge that others similarly situated would be able to exploit these efforts at no cost or risk to themselves. *See Taft v. Ackermans*, 2007 U.S. Dist. LEXIS 9144, at *33 (S.D.N.Y. Jan. 31, 2007) ("'[T]he class action mechanism and its associated percentage-of-recovery fee award solve the collective action problem otherwise encountered by which it would not be worthwhile for individual investors to take the time and effort to initiate the action.'") (citation omitted). Furthermore, the significant expense, combined with the high degree of uncertainty of ultimate success, means that contingent fees are virtually the only means of recovery in such cases. Indeed, lawyers that pursue private suits such as this on behalf of investors augment the overburdened SEC by "acting as 'private attorneys general.'" *Ressler v. Jacobson*, 149 F.R.D. 651, 657 (M.D. Fla. 1992). Thus, "public policy favors the granting of [attorney] fees sufficient to reward counsel for bringing these actions and to encourage them to bring additional such actions." *Id.*

Where, as here, Lead Counsel assumed substantial risk in undertaking this action and achieved a significant benefit to the Class, an important public policy is served by awarding attorneys' fees that adequately compensate counsel. Lead Counsel respectfully submits that the requested fee of 20% of the Settlement Fund adequately compensates Lead Counsel for its time, effort, risk undertaken, and particularly meaningful achievements in this case.

### C. The Class's Reaction to the Fee Request

The positive reaction of the Class following the dissemination of the Court-prescribed Notice and Claim form and publication of Summary Notice, which advised the Class that Lead Counsel would seek a much higher fee than what Lead Counsel currently seek, further supports Lead Counsel's fee request. The Notice explains to Class Members that Lead Counsel will

submit a request for attorneys' fees of up to 30% of the Net Settlement Fund; however, upon further consideration, Lead Counsel has lowered its requested fee to 20% of the Net Settlement Fund. In accordance with the Preliminary Approval Order, on or before January 6, 2016, the Court-appointed Claims Administrator, Epiq Systems, Inc. ("Epiq"), mailed the Notice and Claim Form to Class Members identifiable from transfer agent records and to brokers and nominees, published the Summary Notice in the *Investor's Business Daily* and over the *PR Newswire* on January 12, 2016, and published the Summary Notice twice in the International Edition of *The Financial Times* on January 12 and 13, 2016. *See* D.E. 96-1. at ¶¶ 3, 6. During the process of providing Notice to Class Members, Epiq received requests from brokers and nominees to send additional Notice packets for their customers with relevant holdings. *Id.* at ¶ 5. As of March 24, 2016, Epiq has mailed 95,207 Notice packets and received 2,729 Proofs of Claim. Supplemental Declaration of Stephanie A. Thurin Regarding Notice Dissemination and Exclusion Requests, Exhibit 2 to Miller Decl., at ¶3.

To date, not a single objection has been filed challenging either the Settlement or Lead Counsel's fee and reimbursement request of up to 30% of the Net Settlement Fund, and only one valid request for exclusion has been received. *Id.* at ¶¶6, 7. Although the April 5, 2016 deadline to object to any aspect of the Settlement, including the request for fees and expenses, has not yet passed, Class Members' lack of objection supports Lead Counsel's fee and expenses request, which is well under the request indicated in the Notice documents. "[S]uch a low level of objection is a 'rare phenomenon.'" *Rite Aid*, 396 F.3d at 305 (citation omitted). Accordingly, the Class's reaction to the Settlement evidences the inherent fairness of the fee request.

### D.  Lead Counsel's Request for Reimbursement of Expenses

"It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class." *In re Flag Telecom Holdings Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 U.S. Dist. LEXIS 119702, at *86 (S.D.N.Y. Nov. 5, 2010). "Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *In re EVCI*, 2007 U.S. Dist. LEXIS 57918, at *57. In the Notice disseminated to the Class, Lead Counsel stated that it would not seek reimbursement of expenses in excess of $200,000. *See* D.E. 90-2 at 9. Lead Counsel respectfully requests reimbursement of expenses in the amount of $123,935.44, which were reasonably incurred during the prosecution of this action, and which is an amount well within the $200,000 expense cap amount conveyed to Class Members in the Notice. *See* Miller Decl. at ¶ 75.

The expenses incurred here reflect the costs necessary to litigate a complex securities action. The bulk of Lead Counsel's expenses derive from professional services rendered by experts, consultants, investigators and the costs of mediation, which were all critical to Plaintiff's success in achieving the proposed Settlement. The remaining expenses are attributable to copying costs, travel, delivery costs, filing fees, and other incidental expenses incurred in the ordinary course of litigation. These expenses are typical of a class action and reimbursable under applicable case law. *See Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys…[and] [f]or this reason, they are properly chargeable to the Settlement Fund."). *See also Teachers' Ret. Sys.*, U.S. Dist. LEXIS 8608, at *17. Lead Counsel has carefully reviewed its expenses to ensure that they were reasonably incurred and necessary to furthering the interests of the Class during the course of the litigation. Accordingly, Lead Counsel

respectfully submits that its reimbursement of expenses in the amount of $123,935.44 should be granted.

## II.        CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that this Court grant Lead Counsel's request for an award of attorneys' fees of 20% of the Settlement Fund plus reimbursement of expenses in the amount of $123,935.44, plus interest on both amounts, as provided for by 15 U.S.C. §78u-4(a)(b).

Dated: **March 24, 2016**                    /s/ Kim E. Miller_____
                                             Kim E. Miller
                                             **KAHN SWICK & FOTI, LLC**
                                             250 Park Avenue, Suite 2040
                                             New York, NY 10177
                                             Telephone: (212) 696-3730
                                             Fax: (504) 455-1498
                                             Kim.miller@ksfcounsel.com

                                             -and-

                                             Lewis S. Kahn
                                             J. Ryan Lopatka
                                             206 Covington Street
                                             Madisonville, LA 70447
                                             Phone: (504) 455-1400
                                             Facsimile: (504) 455-1498
                                             lewis.kahn@ksfcounsel.com
                                             j.lopatka@ksfcounsel.com

                                             *Lead Counsel for Lead Plaintiff Stephen Klug and the Class*

25

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2016, I filed the foregoing upon all counsel of record by using the CM/ECF system. The CM/ECF system will provide service of such filing(s) via Notice of Electronic Filing (NEF).

/s/ Kim E. Miller
Kim E. Miller