G4lWtesC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In re

4   TESCO PLC SECURITIES LITIGATION,        14 Civ. 8495 (RMB)

5   ------------------------------x
                                            New York, N.Y.
6                                           April 21, 2016
                                            2:00 p.m.
7
    Before:
8
                        HON. RICHARD M. BERMAN,
9
                                            District Judge
10
11                          APPEARANCES

12  KAHN SWICK & FOTI, LLC
         Attorneys for Lead Plaintiff and Class
13  BY:  KIM E. MILLER
         BRUCE W. DONA
14
    WACHTELL, LIPTON, ROSEN & KATZ
15       Attorneys for Defendant Tesco
    BY:  GEORGE T. CONWAY
16       STEVEN P. WINTER III

17  K&L GATES LLP
         Attorneys for Defendant Broadbent
18  BY:  PETER N. FLOCOS

19  HOGAN LOVELLS US LLP
         Attorneys for Defendant McIlwee
20  BY:  COURTNEY L. COLLIGAN

21  KOBRE & KIM LLP
         Attorneys for Defendant Clarke
22  BY:  DANIELLE L. ROSE

23

24

25
```

G4lWtesC

1          THE COURT:  Today is set aside for a fairness hearing.

2     I'll just give you a little background, so you have a heads-up.

3          First of all, is there anybody here in the audience,

4     not at counsel table, who wishes to be heard today?  And you

5     would be?

6          MR. KLUG:  Yes, your Honor.  I'm Stephen Klug, the

7     named plaintiff in the action.

8          MS. MILLER:  He's the lead plaintiff, your Honor, my

9     client.

10          THE COURT:  And somebody else in the back.

11          SPECTATOR:  No, I'm not here to appear, your Honor,

12     just observe.

13          THE COURT:  OK.  I'll give you a little background.

14     I'm not going to give you an order today, a final order, but

15     there is some additional information I'm going to request.  I

16     will then issue a more extensive decision and order in which I

17     will approve the settlement, and also any accompanying and

18     related orders, short form order, approving the settlement and

19     legal fees, etc.  The background is this:

20          On March 19, 2015, the Court consolidated six related

21     class action lawsuits against Tesco and several of its officers

22     and directors, appointing Mr. Klug as lead plaintiff and the

23     law firm of Kahn Swick & Foti as lead counsel.  On June 18,

24     2015, lead plaintiff filed a second consolidated amended

25     complaint alleging that defendants had violated Section 10(b),

G4lWtesC

including Rule 10b-5, and Section 20(a) of the Exchange Act by

fraudulently misrepresenting earnings and profits.  On November

25, plaintiff made an unopposed motion for preliminary approval

of class action status and settlement, which "releases all

defendants from all claims in exchange for $12 million in

cash."  Plaintiffs' counsel stated at the time that they would

move for attorneys' fees not greater than 30 percent of the $12

million gross settlement fund, plus expenses not to exceed

$200,000.  The expenses of the claims administrator of the

notice and administration of the settlement were not to exceed

$257,147.06, as I recall.

          On December 23, 2015, the Court preliminarily approved

the stipulation and the settlement subject to further

consideration at today's fairness hearing and certified a class

for purposes of settlement defined as all persons who purchased

or otherwise acquired American depository receipts, so-called

ADRs, and F-shares of Tesco, from April 18, 2012, and September

22, 2014.  Excluded from the class definition are the

plaintiffs in the case entitled Western & Southern Life

Insurance Company v. Tesco, a case that's currently pending in

the United States District Court for the Southern District of

Ohio.

          On or about February 2, 2016, the multidistrict

litigation panel denied defendant's motion to transfer that

Ohio action to this district.  The Court scheduled a fairness

G4lWtesC

1    hearing for April 21, 2016, which is today, to determine

2    whether the settlement is fair, reasonable, and adequate and

3    should be approved by the Court; to determine also whether the

4    class should be certified pursuant to Rule 23 of the Federal

5    Rules of Civil Procedure; and to determine whether a judgment

6    as provided in the stipulation should be entered; and whether

7    the proposed plan of allocation should be approved; and

8    finally, to determine the amount of reasonable fees, time

9    costs, and expenses that should be awarded to lead counsel.

10          On March 24, 2016, lead plaintiff filed a motion for

11   final approval of the settlement and plan of allocation and a

12   separate motion for an award of attorneys' fees and

13   reimbursement of expenses.  Plaintiffs' counsel seeks

14   attorneys' fees of 20 percent of the $12 million settlement

15   fund.  This award of 20 percent of the settlement fund would,

16   according to plaintiffs' counsel, represent a 2.13 multiplier

17   of the total lodestar based on the services performed by

18   counsel.  Counsel has provided an overview of the hours

19   performed in this matter but has not provided time sheets to

20   support those calculations, and that is something that I always

21   need to take a look at so that I can do what the Second Circuit

22   calls a cross-check of the lodestar with the fee, percentage of

23   fee of the award.

24          As of April 18, 2016, the claims administrator, I'm

25   told, has mailed a total of 111,727 so-called notice packages

G4lWtesC

to potential class members and received 6,725 proofs of claim,

and that's something I'm going to ask plaintiffs' counsel to

explain in a little more detail: what the significance is of

6,725 proofs of claim in comparison to some 111,000 notice

packages.

No objections have been submitted to the settlement,

to the plan of allocation, or to lead counsels' fee and expense

request.  The deadline for postmarking any objection was April

5, 2016.  This is something I'm also going to ask for further

information on: three requests to opt out of the settlement

were, as I understand it, received by the claims administrator.

However, only one of these requests was accepted as valid, I

guess, is the term.  One of the requests was deemed to be

invalid because the individual did not appear to purchase the

securities at issue here.  The other claim was deemed to be

invalid because it failed to provide any information to

determine if the individual was in fact a class member.

Lead counsel provides as exhibits copies of these

three exclusion requests.  The question I'm going to ask lead

counsel to address is whether with respect to the two requests

that were determined to be invalid they had an opportunity to

amend or to supply further information that might substantiate

their application to opt out.  In terms of a legal standard,

we're all familiar with the rules that apply to approval of

settlement.  You'll see when I finish this order, which won't

G4lWtesC

be long, that I've reviewed what are called the <u>Grinnell</u>

factors set forth by the Second Circuit.  Also with respect to

attorneys' fees, I have reviewed so far the <u>Goldberger</u> factors,

also set forth by the Second Circuit, which support a review

and approval and the amount of attorneys' fees.  As I said, I

have no doubt that I will be approving this settlement under

the appropriate <u>Grinnell</u> factors, including, by the way, the

complexity, expense, and likely duration of the litigation; the

reaction of the class to the settlement.

        I'm also aware, incidentally, that the parties had the

help of a former United States district judge, Layn R.

Phillips, from Oklahoma, and he is a very helpful individual.

Indeed, I think it has been said in one case that if he were

involved in the mediation, it would be considered presumptively

fair.  I've also reviewed in my own mind and will set forth in

detail the risks of establishing liability.

        I'm postponing until I can review the time sheets the

request for approval of attorneys' fees.  As soon as you get me

those, I'll be able to do that, but I have gone over the

<u>Goldberger</u> factors at least as far as I could so far.  In

addition to the time charges, I am going to ask that some of

the expenses, the larger expenses sought by plaintiffs'

counsel, be documented a little bit further.  In particular,

the largest expenses go to or have gone to payment of experts

and consultants in the amount of $56,523.37.  I would like to

G4lWtesC

1    know a little bit more about who they were and what they did,

2    the consultants and experts.  There's also a fee of some

3    $33,000 to an investigator.  I'd also like to know who that was

4    and a little bit more about that.

5         I'll also get to in that process when I distribute

6    this order the claims administrator expenses.  There is a

7    statement in here that the claims administrator anticipates

8    that there will be some additional expenses.  I would like to

9    know what that anticipation is, so to speak, namely, a dollar

10   amount of how much additional expenses the claims administrator

11   would like to or intends to submit.

12        Now, I'm also prepared to have counsel, if you wish

13   to, for the record make a statement in support of your motion.

14   We can do that right now, if you like, and then I'm happy to

15   hear from defense counsel.

16        MS. MILLER:  Thank you, your Honor.  Do you mind if I

17   go over here?

18        THE COURT:  No.

19        MS. MILLER:  I promise I won't take long.

20        THE COURT:  No, no.

21        MS. MILLER:  I wanted to just make a brief

22   introduction.  In addition to my colleague from my office,

23   Bruce Dona, I actually have a vice president from Epiq, the

24   claims administrator, here.

25        THE COURT:  Great.

G4lWtesC

1          MS. MILLER:  He came in, I think, from Portland today,

2     Mr. Cameron Azari, just in case you had questions that sort of

3     drilled down a little bit more into the process.

4          THE COURT:  I will.  I'm delighted that he's here.

5     You can take as much time as you need.

6          MS. MILLER:  Your Honor, just to take some of your

7     questions first, with regard to the time detail, we have it

8     with us today, and we can hand that up.

9          THE COURT:  All right.

10          MS. MILLER:  We're ready to hand that up now.

11          THE COURT:  OK.  As to that, you mean the time sheets,

12     correct?

13          MS. MILLER:  Yes, we have the time sheets.

14          THE COURT:  OK.

15          MS. MILLER:  Well, we have the individual entries with

16     the explanation prepared by the attorney or the paralegal or

17     whoever it was on our staff.

18          THE COURT:  Yes.

19          MS. MILLER:  As to your questions regarding expenses,

20     I actually have our backup expense detail and can answer the

21     questions that you have about those big-ticket items, and if

22     you want, I can give you something with more detail, but it's

23     not very pretty right now.

24          Just specifically as to your questions, our

25     investigator in this case was Gryphon Investigations, and

G4lWtesC

1    actually in this case, your Honor, we interviewed, and this was

2    unusual for us.  We interviewed three different investigation

3    firms in this case.  We had some specific concerns as the case

4    focused on some conduct overseas, and we wanted to make sure we

5    had an investigation team that was experienced and capable.

6    Actually, the first firm, who we didn't hire, was based in

7    London.  We ended up going with someone based in the U.S., and

8    their fee was the full 33,000 and change that's listed on our

9    expense application.

10          In terms of our experts and consultants, there were

11   three.  The first was FailSafe CPA.  We worked with the head of

12   that firm.  His name is Keith Mautner.  We found Keith

13   specifically because unlike cases that I've done for the last

14   20 years involving GAAP, this case fell under IFRS, the

15   international forensic accounting standards; IFRS is the

16   abbreviation, even though it doesn't match the words.  Keith

17   had substantial experience in that regard, and if you look to

18   our complaint, there are some pretty detailed charts in there

19   that address inventory, profits, commercial income.  All of

20   that stuff was prepared in consultation with Keith who spent a

21   substantial amount of time investigating the public filings and

22   discussing issues with us and doing research on the related

23   provisions of IFRS, and I believe his portion of the consulting

24   expenses, which I apologize we grouped them together, was

25   31,902.75, and then two other consultants, both economic and

G4lWtesC

damages consultants.  One was Mulholland & Co., which just did a brief amount of work amounting to about $4,978.12.  And then we also retained Global Economics Group and worked with Chad Coffman.  In that regard, Mr. Coffman assisted us with our mediation, and actually both sides had economics consultants who submitted some documentation that Judge Phillips reviewed, and actually I believe their expert came along and gave a presentation in the room and ours was on the phone, and they also talked to each other.  So they were very involved, and both of these consultants, these economic consultants, that we used helped us to assess.  We have a figure in our papers saying our maximum damages that we thought we could recover if we survived through trial and appeals, $48.1 million.  They're in alignment on that figure, and we recovered 25 percent of that.  So Mr. Coffman of Global Economics Group has the balance of those consulting expenses.  I have here two bills.  I can't add it up in my head, but I believe it amounts to approximately $20,000.  Those were the main breakdowns, and of course Judge Phillips's firm is on there as well as a separate category.

THE COURT:  While you're on that, for the record, I think it would be useful to have it historically.  How did you find Judge Phillips, and how did that process come about, and where did it take place?  I think there were written submissions, as you suggest.  Did you also all meet with him?  Tell us more about that process.

G4lWtesC

```
 1          MS. MILLER:  Right.  With respect to Judge Phillips's

 2   involvement, both my firm and Mr. Conway's firm have worked

 3   with him previously in other matters.  And Mr. Conway reached

 4   out to me while the motion to dismiss was pending.  We wanted

 5   someone who has broad experience with these issues.  It was

 6   particularly, maybe not the biggest case, but a pretty

 7   complicated one, so we agreed right off the bat to try to get

 8   on his schedule, and he actually came to New York and we

 9   mediated.  We had a full-day mediation, and again they brought

10   people from the company and they also brought their forensic

11   consultant, and we had Mr. Coffman on the phone.

12          THE COURT:  This is defendants.

13          MS. MILLER:  Yes, that was.  I believe we reached the

14   settlement in the evening hours, your Honor.  Prior to the

15   mediation, we exchanged submissions.  I wanted mine to be

16   confidential, but I was talked out of it by Judge Phillips and,

17   I think, Mr. Conway, so we exchanged those.  We also did reply

18   submissions, and I think there might have been also a

19   supplemental submission relating to damages.  There was an

20   issue about the number of shares outstanding, what was the

21   float.  We had a figure that was what the maximum possible

22   float could be.  Mr. Conway had more information that was not

23   publicly available, which led us to conclude after we were able

24   to vet that documentation that our number was too high and that

25   the actual number was 65 million.  All we knew is that it was
```

G4lWtesC

somewhere south of 250 million, but we didn't know, so that

impacted our damage figure and our analysis and was something

that was addressed at the mediation.

    I know your Honor has said that you intend to approve

the settlement.  We're very proud of the settlement, and we

believe it readily meets all of the relevant factors under

Grinnell, but I would like to just point out a couple of things

with regard to the complexity of the litigation and the risks

faced in this case.  As I mentioned, we specifically searched

for, and it wasn't easy to find him, a forensic accountant who

was specifically versed in IFRS matters, and our complaint

shows those complex issues pleaded in accordance with the PSLRA

and 9(b).  We did our very best in that regard.  Those issues

were quite difficult and complicated, but we also faced a very

difficult preliminary legal issue under Morrison, and this was

an issue that was brought to your Honor's attention at our

initial status conference.

    We had a conference at which we were discussing

whether or not I would amend my complaint, which I did, and we

submitted a second amended complaint.  At that status

conference, Mr. Conway brought up your Soc.Gen. decision from

2010.  A substantial focus of the briefing on the motion to

dismiss and the focus at the mediation was, Do we have a claim

under 10(b) for these ADRs, and the F-shares that are wrapped

into the POA in this case, your Honor, they're not part of the

G4lWtesC

second amended complaint.  They were folded in, and there was a

movant that claimed to have F shares and there are claimants

who have F-shares.  But basically in 2010, the Supreme Court

issued the Morrison decision.  Your Soc.Gen. decision came out

shortly thereafter, I believe September of 2010, and if that

were the end of it, our case would be dead under your analysis

in Soc.Gen.  Now, since that decision came out in 2010, the

Second Circuit has two rulings that we argue support our

position on the fact that the ADRs are domestic transactions

under Morrison and that the Soc.Gen. decision is no longer

consistent with the new guidance from the Second Circuit in the

Park Central case and the Absolute Activist case.  Those were

some pretty interesting hot-button, new issues.  We got some

press.  I think we even referenced an article in our papers.

There was a lot of interest as to how this would be resolved,

and it was definitely something that Judge Phillips pushed both

sides on.

          THE COURT:  He is a retired federal judge, right?

          MS. MILLER:  That's right.

          THE COURT:  And practices now at a firm?

          MS. MILLER:  He has his own firm.  He used to be at

Irell & Manella and recently, in the past year, has opened up

his own firm.  It's also based in California.

          THE COURT:  I see.

          MS. MILLER:  But he often comes to New York for

G4lWtesC

1    mediations, particularly if he's interested in the case, and in

2    this case he was.

3          One other Grinnell factor to focus on, and again I

4    think I mentioned it here, we didn't have just one but two

5    heavily vetted economists who said, You know, your maximum

6    number is 48.1.  That wasn't just a number that we got from

7    somebody the day before, to say, Oh, give us a number that's

8    low so we can say that we got 25 percent.  That was really a

9    number that we were engaged in, vetted heavily, and had input

10   from the other side and from Judge Phillips, etc.  We think

11   that that is really a terrific result, particularly in light of

12   the legal uncertainties with the ADRs.

13         Just to turn briefly, if I might, if your Honor has no

14   other questions about the settlement itself, to the plan of

15   allocation.  It's a pretty simple plan.  It just really has two

16   pieces on it, one for the ADRs and one for the F-shares, and

17   the only difference there is the amount of the drop

18   attributable to the alleged fraud; it's different in each case,

19   because they were trading at different prices.  That's really

20   the only difference there.  It's pretty straightforward, and

21   our papers set out the details.  The notice, of course,

22   contains the entire plan of allocation.  There have been no

23   objections, and it conforms with Dura Pharmaceuticals: you have

24   to hold until the end; there is only one drop in the case.

25         THE COURT:  Would you address the significance of the

G4lWtesC

response in terms of proofs of claim vis-à-vis other cases

you've been familiar with.

MS. MILLER:  Yes.

THE COURT:  I'm not sure I know what to make of 6,725

proofs of claim.  Obviously it depends on how many people were

eligible, but tell us about that.

MS. MILLER:  Your Honor, a couple of points on that.

So far around 6,700.  Those are forms that have been returned,

but what really matters is how many shares are covered about by

those claims.

THE COURT:  Are represented.

MS. MILLER:  People have until May 5 to submit their

forms.

THE COURT:  Right.

MS. MILLER:  Typically at this point we don't have

available any numbers regarding how many damage shares are

covered by those claims because there's an extensive and

necessary vetting process.  There's often duplicates.

Mr. Azari can speak more to these issues, but Mr. Klug, our

lead plaintiff, had some questions and he obviously has a

vested interest in knowing how many other people are going to

claim here, so we asked Epiq to do some preliminary research,

and they had initially given us a number a few days ago that

was 24 million shares are covered so far.  Our experts estimate

that there are 31 million damage shares.  I should say expert;

G4lWtesC

```
 1   that was from Mr. Coffman.  I was quite surprised that the
 2   number was that high and asked her to go back and see if she
 3   could find more information, and again this was very
 4   preliminary, not typically done, and the "she" I'm referring to
 5   is Stephanie Thurin, who has put in several declarations
 6   relating to steps in the administrative process.  It turns out
 7   when they went back and took a closer look, because again this
 8   was before the vetting stage even begins, they discovered that
 9   20 million of those shares were purchased overseas, not a class
10   member.  We have, right now it looks like, about now 4 million
11   damage shares out of a maximum of 30 million damage shares.
12            THE COURT:  And more to come, so to speak?
13            MS. MILLER:  In my experience, and I think this is
14   also something that Mr. Azari can speak to more, you typically
15   get a handful of big numbers at the end, and it's pretty busy
16   toward the deadline for filing the proof-of-claim forms.  With
17   respect to your question, in my experience, there has been a
18   lot of interest, a lot of claim forms submitted, a lot of
19   damage shares covered, and that's part of the reason why you
20   see the administrative expenses are higher than anticipated.
21   And also with respect to the administrative expenses, I should
22   point out that my firm sought competitive bids from eight or
23   nine companies.  We received bids from four companies.
24            THE COURT:  For claims administration?
25            MS. MILLER:  Yes.  I'm sorry.  Yes, claims
```

G4lWtesC

1    administrators, and we were looking at two factors in selecting

2    a bidder, not only price, but also competence and the ability

3    to get this done right, because it is an incredibly important

4    process.  There was, I believe, one other claims administrator.

5    It wasn't really an apples-to-apples comparison, but similar in

6    price but not in reputation, and we felt it was very important

7    to have a claims administrator that has a substantial

8    background, and they know what they're doing.  They have a ton

9    of experience doing these cases, and that's why when I called

10   them up and I said:  24 million damage shares doesn't make

11   sense to me.  I know you're trying to scurry around and give us

12   some preliminary information so that we can talk to our clients

13   about what's happening, but it doesn't seem right.  And within

14   24 hours, they had figured out what the problem was, and now

15   it's more in line with what the expectations are.  But I would

16   say substantial interest.

17          With respect to your question about the exclusions --

18          THE COURT:  Before you get to that, let's say it

19   doesn't come out to be 4 or 5 million damage shares out of --

20   you say 30?

21          MS. MILLER:  We estimate about 31 million damage

22   shares.  In fact, that was in our initial draft of the notice,

23   but not in the final notice that went out, because we

24   streamlined it in accordance with your Honor's procedures.

25          THE COURT:  How does that stack up percentagewise in

G4lWtesC

1    terms of proofs of claim?

2                 MS. MILLER:  In terms of?

3                 THE COURT:  Well, participation in the settlement.

4                 MS. MILLER:  Right.  Participation in the settlement

5    is unusually high to date.  For me probably one of the highest,

6    and again, we have been surprised and pleased.  It is higher

7    than usual.

8                 THE COURT:  What's the metric or what's the norm?

9                 MS. MILLER:  There is not a norm.  I would say

10   depending on the case and the age of the case, cases that are

11   more recently filed, such as this one, tend to have a more

12   active response than older cases, although some of the very old

13   cases have big institutional holdings, and sometimes there can

14   be big recoveries there.  But I just had a discussion with

15   Stephanie Thurin about this earlier this week, and I also had a

16   discussion with Chad Coffman about it, but in Stephanie's

17   experience, and again Mr. Azari can speak to this further, she

18   said somewhere between 20 percent and 50 percent is possible.

19   She had one case that was 80 percent, and it was crazy unusual.

20   I have seen cases with 10.  That would be devastating.  That's

21   too low.

22                 THE COURT:  Got it.

23                 MS. MILLER:  If I might briefly speak to the

24   exclusions, you had a question, which was, Did the exclusions

25   that were not valid have an opportunity to address those

G4lWtesC

```
1    issues.  Actually, I think in one instance we had to track down
2    a phone number and in the other a phone number was provided.
3    We reached out to both but did not hear back from either, but
4    it was very clear of the two one of them was plainly not
5    ADR-subject; it was not a class member.  And the other one
6    seemed like it wasn't a class member, but we tried to reach out
7    to that person and could not reach them.  Yesterday, a late,
8    well, a timely stamped exclusion came in from Canada.  It took
9    three weeks to get to us.  A couple thousands shares had issued
10   there.  We actually just got in touch with that person today.
11   It's the executor of an estate, and I just learned that, in the
12   courtroom, because I had already left to go to court, that
13   apparently the estate has already dealt with all of the
14   financial issues and would have to be reopened to address what
15   would potentially amount to around a thousand dollars, or so,
16   so she didn't want to be involved in that process and, I guess,
17   just sent that letter not understanding at the time that she
18   didn't need to submit that letter and could have just done
19   nothing.  She doesn't intend to sue Tesco, so she wasn't opting
20   out to preserve her rights.  She just thought that she didn't
21   want to have to deal with some paperwork and some funds and no
22   place to put them.
23              THE COURT:  Got it.
24              MS. MILLER:  Your Honor, just briefly on class
25   certification, we respectfully submit that the requirements of
```

G4lWtesC

23(a) and (b)(3) predominance are met here, and that the class should be conditionally certified with Mr. Klug as the representative, who very vigorously and diligently oversaw the litigation, and although he wasn't in the room at the mediation, he was in touch throughout the day with my partner Lew Kahn and was, frankly, instrumental in the result that we received, which again we think is a terrific result here.

On the fee application, just a few points to make. Obviously we've addressed the Goldberger factors, all of them, in our brief, but just to focus in on a couple of things, as I think you've noted in the Elan case, and in our briefs we mentioned some other cases in the Second Circuit, when you're dealing with novel and complex issues, that increases the risk and the risk in the litigation versus the results obtained is a real focus under Goldberger. In addition to the issue that I mentioned with respect to the ADRs in Morrison, I would also say that this sort of dovetails nicely into one of the old Goldberger factors, which is the competence of your adversaries. We, of course, mentioned in our papers Mr. Conway, who I've gotten to know just a bit in this case, who is a lovely man but happens to be quite capable of defending his clients' position before the Supreme Court and got the ruling in Morrison and the opinion by Judge Scalia there, which we were vigorously debating the importance of in connection with Soc.Gen. and the more recent case law in the

G4lWtesC

1   Second Circuit on those issues of extraterritoriality.

2           Also, the defendants had raised issues on *forum non*

3   *conveniens*, and although we believe that we have a very strong

4   argument there, they submitted a declaration from an English

5   barrister supporting their position, so again, in addition to

6   all of the standard fair arguments in a motion to dismiss in a

7   10(b) securities case, which are in and of themselves difficult

8   for plaintiffs to deal with, we had several unusual and

9   different ones that are not typically of focus in a 12(b)

10  motion in the early stages.  And also, just to go back, in

11  terms of complexity of the issues and our involvement of our

12  forensic accounting consultant who helped us with the IFRS

13  claims, there's a recent case cited in our papers, In re Fuqi,

14  in which Judge Batts addressed the fact that when you're

15  dealing with accounting issues involving another country's

16  application of the accounting laws there, that can be a

17  substantially more complicated factor and readily supports a

18  fee.

19          I would also say, your Honor, we noticed a fee of 30

20  percent.  We had a retainer agreement with our client for a

21  third.  We are seeking 20 percent here.  It's a 2.13

22  multiplier, as you said.  And as you did all of the hard work

23  for me in stating all the details, you, I believe, said our

24  lodestar, and I'm not positive you said our lodestar, was

25  $1,127,995.50, approximately, and 1,840 hours.  And I apologize

G4lWtesC

1    for not submitting our time detail in advance.  I brought it in

2    today.  Having read all your prior decisions, I should have

3    submitted it before, and I apologize for that.

4              THE COURT:  No problem.

5              MS. MILLER:  I guess I just want to point out that the

6    reaction of the class has been supportive and there's a lot of

7    interest, and our expenses were noticed at 200,000, but they're

8    just $123,935.

9              Finally, turning more, and we talked about it briefly

10   already, to the administration and the notice, your Honor, we

11   respectfully submit that the notice that was issued complied

12   with due process and included an understandable description of

13   the case, and we worked, as your Honor may recall, to revise

14   that notice and streamline it so that it was more accessible to

15   the class members.  I believe you said how many notice packets

16   have gone out, and essentially, I wanted Mr. Azari to have an

17   opportunity to address the Court in the event the Court has

18   questions.  The most recent submission on costs from Ms. Thurin

19   indicates, I believe, they're at 245,000, but again, because

20   there's been substantial interest in the settlement and more

21   notice packets than anticipated, the costs are continuing and

22   there's quite a bit more work to be done here to wrap this up.

23   If there are any questions, especially since he came in all the

24   way from the West Coast, maybe we could give him a moment to

25   address the Court on the administration.

G4lWtesC

```
 1              THE COURT:  Sure.  Before we turn to that, I have one
 2    more question to you.
 3              MS. MILLER:  Yes.
 4              THE COURT:  Tell me a little bit about the discovery
 5    process here, including if there were depositions or if it was
 6    just documents up until now, and if there were depositions, how
 7    many, and that kind of thing.
 8              MS. MILLER:  Your Honor, there was document discovery
 9    only, about 10,000 pages, things like board and executive
10    committee meeting notes and emails.  That was about 10,000 or
11    12,000 pages, and also, since we did not have the benefit of
12    formal discovery prior to the decision on the motion, that was
13    one of the reasons why we dug in hard on the investigation
14    front, and we cite in the complaint one former high-level
15    witness at the company who indicated that management was not,
16    well, this is an allegation again, management wasn't insisting
17    on compliance with certain rules and regulations with regard to
18    the inventory practices.  We were able to unearth that despite
19    the fact that there was no formal discovery, but in connection
20    with the settlement, we did get some documents confirming that
21    the settlement is fair, reasonable, and adequate.
22              THE COURT:  Great.  Thanks.  I would like to hear from
23    the claims administrator just briefly.
24              MR. AZARI:  Your Honor, I appreciate the opportunity
25    to come into the court today.  What specifically would you like
```

G4lWtesC

1    to hear?

2           THE COURT:  You can tell us just very briefly for the

3    record what the claims process has entailed so far.  That's

4    just a factual summary, and then I'm going to ask, I think I

5    know, but for the record how much your firm has rung up in

6    expenses so far.

7           MR. AZARI:  Sure.

8           THE COURT:  And what your projection is to get us to

9    the end of the process.

10          MR. AZARI:  I think I can answer all but the last

11   question.  It's been a fairly typical securities case process

12   where based on the shares involved in the case, we sent out

13   notice to the standard list of brokers, dealers, nominees, and

14   either requested that they provide us with names of holders so

15   we could provide the notice to or they could go ahead and

16   provide notice themselves.  On that point initially the

17   estimate anticipated about 50,000 notices would go out.  To

18   date we've mailed out, as you said, over 111,000, so getting to

19   the differences in our initial cost projections, that's one of

20   the primary drivers in a higher cost.  Our per-claim package

21   rate is, of course, the same as we said it would be, but with

22   over 61,000 more notices sent out to date, that's been a big

23   driver postissue.

24          Then the conversation about the claims received so

25   far, echoing what counsel said, in our experience, the claims

G4lWtesC

1    response has been very good, and with the filing deadline of

2    May 5 still a couple of weeks away, it's our experience that we

3    expect a bump in claims to come at the end, not only in volume,

4    but also the larger value claims.

5              THE COURT:  Institutional holders.

6              MR. AZARI:  Yes.  Those come in at the end of the

7    process quite often, so we would be surprised if we did not

8    exceed 20 percent -- if we did exceed, excuse me, 20 percent of

9    the 30 million that are out there.

10             THE COURT:  6 million?

11             MR. AZARI:  Correct.  I think we'd be surprised if

12   that didn't happen.  In our estimation, this has gone very

13   smoothly so far.  We have an interest in everything going well

14   just as much as everyone else, so we're very pleased in how

15   things have occurred so far.  For us, I know your Honor would

16   like a firm-and-fast number; it really depends on how many

17   claims come in the door.  We have a per-claim price.  We don't

18   charge any hourly time over that.  It's just that price per

19   claim, and so shortly after May 5, we'll know.

20             THE COURT:  You'll know.

21             MR. AZARI:  We'll be able to come back and say, Your

22   Honor, this is what it's going to be to finish this process.

23   We'll still have a lot of work to do, process the claims.

24   There will be defective claims.  We'll have to send out letters

25   to have those cured, go through that process, do our final

G4lWtesC

```
 1    calculations, and do the distribution, but we'll know what it's
 2    going to be once we have the total number back.
 3              THE COURT:  About two weeks, a little more?
 4              MR. AZARI:  A little more, because the one example of
 5    the really late-arriving opt-out, there's go to be a few claims
 6    that come in on May 15, something like that.
 7              THE COURT:  My policy generally has been with respect
 8    to that to be liberal and generous, unless it's absolutely
 9    obvious that it's a claim that should not be considered, but to
10    bring them in under Rule 10.
11              MR. AZARI:  Understood.
12              THE COURT:  Great.  Thanks.
13              MR. AZARI:  You're welcome.  Thank you.
14              MS. MILLER:  Your Honor, just a couple final points.
15    We submitted, and I'm sure you won't be needing it or using it,
16    a form of order a couple months ago that didn't include some
17    language that inadvertently got omitted, so we would like to
18    resubmit to you a Word version of our most recent version, with
19    our apologies.
20              THE COURT:  Great.
21              MS. MILLER:  And would you like to have our time
22    detail handed up?
23              THE COURT:  Yes.
24              MS. MILLER:  OK.
25              THE COURT:  This is an extra set?
```

G4lWtesC

| | |
|---|---|
| 1 | MS. MILLER:  This is an extra set just for you.  I |
| 2 | didn't give this to the defendants. |
| 3 | THE COURT:  This is the time sheets. |
| 4 | MS. MILLER:  That's the time detail, and I can provide |
| 5 | for your Honor by close of business Monday, if you like, the |
| 6 | expense breakdown. |
| 7 | THE COURT:  Sure.  That would be great. |
| 8 | MS. MILLER:  We'll just submit that on Monday. |
| 9 | THE COURT:  Now that's the front table.  How about |
| 10 | from Mr. Conway? |
| 11 | MR. CONWAY:  On behalf of defendant Tesco, your Honor, |
| 12 | we think the settlement is fair, reasonable, and adequate in |
| 13 | all respects, and unless the Court has any questions for us, we |
| 14 | concur in the reasons set forth by the plaintiffs in their |
| 15 | memorandum here today. |
| 16 | THE COURT:  I do have a small question. |
| 17 | MR. CONWAY:  Sure. |
| 18 | THE COURT:  Do you have experience working with the |
| 19 | judge in this case?  Have you done mediations with him before? |
| 20 | MR. CONWAY:  Judge Phillips.  If you had to pick |
| 21 | somebody who has the highest market share in this business, you |
| 22 | would pick Judge Phillips, and he is highly respected by both |
| 23 | plaintiffs' lawyers, by defense lawyers, and by insurance |
| 24 | carriers.  He's probably the most prominent of all the |
| 25 | mediators in this space. |

G4lWtesC

 1          THE COURT:  Great.  Anybody else?  Should we hear from

 2   Mr. Klug at this point?  Does anybody else want to be heard?

 3          Yes, sir.

 4          MR. KLUG:  Thank you, your Honor.  Your Honor, I have

 5   some brief written remarks that I'll read, and then you're

 6   certainly welcome to interrupt me while I'm saying those and

 7   ask any questions after I'm finished.  As I said, my name is

 8   Stephen Klug, and I am the lead plaintiff in this case.  I'm

 9   here today to object to plaintiffs' counsel request for

10   attorneys' fees and seek your assistance in determining what

11   fees might be appropriate.

12          I'd like to briefly share some background on me, which

13   I believe shows I'm qualified to make the remarks I'm going to

14   be making.  I'm a 63-year-old retired father of three and

15   grandfather of twelve.  That has nothing to do with anything,

16   but I just like to talk about my grandkids.  I received a

17   bachelor's and an MBA degree from Northwestern University in

18   Evanston, Illinois, and a law degree *summa cum laude* from

19   Cleveland State University.  After practicing law for several

20   years at Thompson, Hine & Flory in Cleveland, I returned to

21   work at Progressive Insurance, where I started a program in

22   conjunction with the American Bankers Association to provide

23   director and officer liability insurance and fidelity bond

24   coverage.

25          THE COURT:  Slow down a minute.  I'm not sure I got

G4lWtesC

it.  To provide?

            MR. KLUG:  Director and Officer liability insurance
and fidelity bond coverage to ABA member community banks.  I
wrote the original D&O policy used in the program and created a
culture in the program based on loss prevention and independent
review of all claims submitted.  That program was very
successful, and it's still in operation today.  In the early
'90s, I started a new program at Progressive to write D&O
insurance for companies undertaking an IPO.  I later purchased
this business from Progressive and subsequently sold it to
General Reinsurance, now a subsidiary of Berkshire Hathaway.
Like the ABA program --

            THE COURT:  Like the?

            MR. KLUG:  American Bankers Association program, ABA
for short, the IPO business was focused on loss prevention and
independent factual investigation of claims submitted.  In
short, I'm not a newcomer to securities litigation, although my
career was clearly spent on the defense side.  And while I'm
not here to object to the settlement itself, I certainly don't
think it's the great victory that plaintiffs' counsel would
have us believe, and since this goes to the issue of the
appropriateness of the fees requested, I'd like to share my
views briefly.  I believe the Tesco case was a very strong one
for plaintiffs.  In fact, had I been the D&O underwriters with
Tesco's D&O policy, I would have reserved my limits.  There's

G4lWtesC

1    no doubt that fraud was committed, and the company has admitted

2    as much.  Throughout the case -- excuse me.  Throughout the

3    course of the case, counsel communicated to me that they shared

4    this belief and that we would prevail on the jurisdictional

5    challenge presented by defendants' motion to dismiss.

6         I consulted Kevin LaCroix, who is a personal friend

7    and someone that I hired for our IPO business some 20 years ago

8    to write the article that he wrote in the D&O diary, and I did

9    that after Kevin confided to me that he believed that we had

10   the superior legal argument.  He did say, however, I might not

11   be happy with the article because he has to try to be

12   evenhanded, and he does have quite a few friends in the defense

13   bar.  But more than that, one week before the mediation,

14   counsel emailed me that we should prevail on the jurisdiction

15   issue unless the Court "will fail to apply the law correctly."

16        THE COURT:  It happens.

17        MR. KLUG:  And any time I give you quotes, I have the

18   material.  If you'd like me to submit it to the Court, I'd be

19   happy to.

20        THE COURT:  Sure.

21        MR. KLUG:  So with this background in mind, I was

22   shocked to receive communication from counsel attending the

23   mediation that we would "probably lose" on the motion to

24   dismiss and that I should authorize a settlement of $9 million.

25   Counsel further advised that should I approve that amount, they

G4lWtesC

would "shoot to try to get you an incentive award."  At the
time, your Honor, I didn't know if I was being bribed to
approve a settlement or what was going on.  There had been no
discussion of any incentive award whatsoever, but apparently
counsel thought this might help in getting my agreement to
approve the settlement.  And here's where I made a big mistake.
I should have simply said no settlement.  Instead, I responded
that I would not approve anything less than 12 million and went
to bed thinking the case wasn't going to be settled.  And I
should say I went to bed because I was six time zones away.
It's no excuse, but it was late at night, and that's how my
mind was working at the time.

         When I found out the next morning that the case had
settled, I did not feel good.  I felt terrible.  Counsel
advised me that I could not discuss the case with anyone until
the settlement was announced, so I did nothing until then.
Once the settlement was announced, I undertook my own
investigation of other alternatives available to plaintiffs in
the class.  I discovered both the pending case in Ohio, which
you referenced before, and the developing case in the U.K.
being privately financed.  I contacted counsel in both those
cases and I determined that I could participate in either one
of them if I opted out of this case.  I called my counsel and
advised them of what I'd learned and told them I was
considering opting out of the case.  They were not happy.  I

G4lWtesC

 1    ultimately determined that since I had approved the 12 million,

 2    I should remain in the case.  However, I strongly believed that

 3    our proposed notice to the class failed adequately to advise

 4    claimants that they had other potential avenues available if

 5    they wished to pursue them.  Counsel agreed to present my

 6    concerns to you at the hearing on the notice, and they advised

 7    me of your comments.

 8            At this point, your Honor, I would just like to ask if

 9    you recall that and if you could tell me what your comments

10    were.

11            THE COURT:  I don't recall exactly, but there is, I'm

12    certain, a transcript of that entire proceeding, which I would

13    refer you to.  Even if I did recall, I'd say look at the

14    transcript, because that would be the most definitive resource

15    for what happened there.

16            MR. KLUG:  I would certainly like both of us to look

17    at that so we can just see for the record, because in my mind,

18    it seemed that you can hardly make a decision in a case like

19    this that doesn't work for the benefit of all the members of

20    the class in giving them the greatest amount of disclosure.

21            THE COURT:  Just on that point, and it's a general

22    point, but in my mind, there's always a tension between a

23    24-page, single-spaced document that lawyers only could perhaps

24    understand what is being said and a more user-friendly or

25    shareholder-friendly one, which might contain maybe less

G4lWtesC

detail, so I'm always trying to strike a balance between when

the individual gets the former, the 24-page, single-spaced

document.  I don't know how many people actually sit down and

read those and understand those, etc.

MR. KLUG:  Yes, your Honor.  I certainly agree, but I

can't imagine a more important point for someone considering

whether or not to participate that there might be other

available options for them to pursue, even if it was simply a

sentence with a website or a telephone number.

In short, this is tied to another issue, your Honor,

that I pursued during the course of this litigation.  I was

aware of the Morrison issue, if you will, and aware of the

risks we had on the motion to dismiss, and I continuously said

to counsel:  What if we lose?  What are we going to do?  Where

are we going to go?  Can't we go to the U.K.?  And I was told

primarily, Don't worry, we're not going to lose; but if we do,

we'll worry about that when the time comes.  In retrospect, I

believe that if counsel had prepared a comprehensive plan that

included a contingency plan for an action in the U.K., if we

were to lose the jurisdictional argument, that defendants would

have settled for more or we could have prevailed in the

alternate form.

THE COURT:  In the U.K.

MR. KLUG:  In the U.K.  And I think one of the reasons

why I'm critical of plaintiffs' performance and thus its

G4lWtesC

```
 1    request for its fees is that I believe they looked very

 2    narrowly, only in the U.S., not beyond the U.S., and that hurt

 3    us, quite frankly.

 4            I also believe counsel's been less than forthcoming

 5    regarding comments made in their brief regarding the fee

 6    application.  On page 23 of the brief, they state that "to date

 7    not a single objection has been filed challenging either the

 8    settlement or lead counsels' fee and reimbursement request up

 9    to 30 percent of the net settlement fund."  Your Honor, I sent

10    them an email as soon as I received the notice that said not

11    only would I not support 30 percent, but if they asked for

12    anything more than 20 percent, I would come to this hearing and

13    object and bring an expert witness.  So I think that's quite at

14    odds with the impression that was given in the brief filed with

15    you.  At this point you may be saying to yourself:  Why the

16    hell are you here?  You got your 20 percent.

17            THE COURT:  I'm not saying that.

18            MR. KLUG:  You might, I said.  And here's why, your

19    Honor.  When I look at the totality of the documents that were

20    filed and the impression that it gave of this rah-rah team on

21    our side that was all very happy with what happened, that's

22    quite at odds with my view of the case.  I believe, frankly,

23    that my attorneys wanted to settle the case to lock in a pretty

24    good fee at a time that was very good.  This has got to be

25    among the shortest in duration of most securities class action
```

G4lWtesC

1    lawsuits that I'm familiar with.

2          I guess in conclusion, I personally lost $900,000 on

3    my Tesco investment and stand to recover, and my numbers have

4    varied quite a bit, anywhere between 45 and $70,000, while

5    counsel could walk away with a fee of 2.4 million.  And just on

6    a final note, and I will defer to your judgment totally on

7    this, but when I viewed counsels' hourly fees, I found them

8    very hard to take, especially the one lawyer who spent the

9    equivalent of 16.2 weeks full time working on a case that

10   involved filing a complaint, a response to a motion to dismiss,

11   and attending a hearing.  It's conceivable, and this supports

12   my view of why plaintiffs' counsel might have wanted to settle

13   so quickly, if they were burning through the money that quickly

14   on that little bit of litigation, I mean, there's no way they

15   could have supported this case to go through trial.

16          Anyway, that's all I have.  I propose that counsel be

17   awarded fees equal to no more than their actual costs after

18   your consideration of their cost summary.

19          THE COURT:  You mean their actual billings?

20          MR. KLUG:  After you consider the billings and deem

21   them to be appropriate.

22          THE COURT:  I see.  I hear you.  That's the bottom

23   line of what you're saying.

24          MR. KLUG:  Yes, your Honor.

25          THE COURT:  OK.  Fair enough.

G4lWtesC

```
1              MR. KLUG:  Thank you.

2              THE COURT:  I appreciate that.

3              Do you want to respond?

4              MS. MILLER:  I would like to, your Honor, make a

5    couple comments.  Your Honor, I did not know that Mr. Klug was

6    going to object to the fee today.  I knew that he wanted to

7    speak.  He indicated that he was going to come up here.  I

8    respect his concerns and views.  I just want to point out a few

9    things.  He did approve the settlement.  He was involved in the

10   settlement.

11             THE COURT:  OK, but before you get to that, I also

12   respect his views and I think it's helpful and I'm glad that he

13   did come.

14             MS. MILLER:  Yes.

15             THE COURT:  Sometimes, perhaps even often, we have a

16   fairness hearing and nobody comes, so it's an interesting

17   perspective, especially since he had such a substantial loss.

18             MS. MILLER:  He does have a substantial loss.  Sorry.

19             THE COURT:  That's all.

20             MS. MILLER:  He does have a substantial loss, your

21   Honor.  As we were addressing, I mean, we had substantial

22   discussions with him between the time the settlement was agreed

23   to and today.  I did not recall his precise out-of-pocket loss,

24   but his recognized loss under the plan of allocation required

25   by Dura is well under 300,000, and we had one of our economic
```

G4lWtesC

```
1    consultants prepare a memo for him that said if 10 percent

2    claim, you get this; if 20, this; if 50, this.  And so he had

3    an understanding that the amount of money that he got was

4    dependent on how many people claimed and also that there are

5    legal limitations here on what is recoverable because of Dura

6    Pharmaceuticals.

7          Regarding the notice issues, at the preliminary

8    approval hearing, I did indicate to you that my client had

9    three questions for you, and I think I indicated that I wasn't

10   sure that I really wanted to ask them, but I felt compelled

11   because my client wanted me to ask them.  They related to

12   whether the notice should include language about the Ohio case

13   that was pending and whether we should include language that

14   people could proceed potentially overseas, and there was one

15   more question.  I don't remember it.  The notice and the

16   summary notice both referred to the Ohio case.

17         We did get contacted by the firms that he spoke to in

18   the U.S., including lawyers who were considering litigation in

19   the U.K.  Unfortunately for Mr. Klug's potential claims in the

20   U.K., the potential case that has not yet materialized in the

21   U.K. involves securities that are not the ADRs that are covered

22   by this case.  And of course, as we noted in our motion to

23   dismiss opposition briefing, if we were to proceed in the U.K.

24   with respect to these claims, there's no class action mechanism

25   and we would be proceeding under a tort theory on an individual
```

G4lWtesC

1    basis, and it's incredibly difficult to get discovery in the

2    U.K. under those parameters.  But anyway, we did state that

3    there was such a case, and we prepared a memo for Mr. Klug

4    regarding the issues that are sort of addressed in the motion

5    to dismiss briefing on the *forum non conveniens* issues, and I

6    think it speaks volumes that there is not a case; that although

7    there were many press releases and different firms involved in

8    trying to gather potential clients for litigation over there,

9    nothing has been served on the defendants as of a few days ago

10   when I last asked for an update from Mr. Conway on that issue.

11           I guess the privilege has sort of been thrown open

12   there.  If your Honor would like to see all of our

13   correspondence, I'm happy to provide it.  I think that the

14   email and telephone discussions, I think I was involved in one

15   phone call with Mr. Klug, but my partner, Lew Kahn, was his

16   main contact, and I've seen many but not all of the emails and

17   have been briefed on some of the discussions but not involved

18   in all of them, and my understanding was that he supported the

19   settlement and was coming today.  I knew that he had requested

20   that we limit our fee to 20 percent, and so I thought that that

21   had resolved the problem.

22           I do just want to say that since it is unusual to have

23   this sort of thing pop up without any forewarning, that I

24   strongly stand by the settlement and I strongly stand by the

25   work performed by my firm and I strongly stand by the arguments

G4lWtesC

made in our papers regarding the risks faced in this case and

the likely outcomes, and I think Mr. Klug stands to get a very

solid result participating in the settlement.  And I admire his

coming here and making this statement, and he obviously has

very strong feelings, and he was a terrific plaintiff.  And

frankly, the class would not have as much money as it got if it

had not been for his involvement.  Thank you.

THE COURT:  OK.

MR. KLUG:  Excuse me, your Honor.  I just have to

reply.  And the most important one is the issue as to whether

or not the ADRs would be covered under the financial

institution act in Great Britain, which, by the way, has a

slightly lower standard of proof, as I recall, than actions

under 10b-5.  But in any event, I contacted counsel in the U.S.

THE COURT:  You mean other counsel.

MR. KLUG:  Yes.  Their name is Scott & Scott, and they

were the ones with the website saying, If you have an ADR come

with us; we're doing this litigation in Europe.  I said, My

folks tell me we can't do that.  They said, Nope, we've done

the research and you can.  So I sent counsel a copy of that

opinion and they came back to me not with results of their

research indicating whether or not that was possible but with a

cite to defendants' expert who had concluded that that would

not be possible because in his opinion the NASDAQ market was an

unregulated securities market.  Now, your Honor, if you Google

G4lWtesC

1    "regulation" and "NASDAQ," you don't have to be much of an

2    expert to see that NASDAQ is heavily regulated, so I have

3    dismissed that argument out of hand, and apparently Scott &

4    Scott didn't feel much of it, but I got no original research

5    from my own counsel.  All I got, and it's sort of interesting

6    that they're all of a sudden relying on affidavits provided by

7    the defense.

8          Anyway, as to the pendency of what's going on in Great

9    Britain, I think that the counsel over there is very prudently

10   awaiting the results of the government investigation into the

11   fraud.

12         THE COURT:  Of the U.K. government?

13         MR. KLUG:  The U.K. government.  The U.K. government,

14   and Mr. Conway would know the name of the office better than I

15   do that's actually doing the investigation, but essentially,

16   they will hand this action over to counsel, having been fully

17   vetted by the British government.  So that's the only thing

18   that's holding that case up.  Thank you.

19         THE COURT:  My understanding is that the settlement of

20   $12 million, perhaps with reluctance, but you have approved

21   that, because that is the number that you gave to counsel as

22   your cutoff, right?

23         MR. KLUG:  That's correct.

24         THE COURT:  That's No. 1.  And two, what you want me

25   to do, which, by the way, I intend to do, I think I said it

G4lWtesC

1    even before you stood up, I'm not yet ready to approve the

2    legal fee aspect because I haven't reviewed the time sheets in

3    particular, and so you want that not to exceed 20 percent of

4    the 12 million.  Is that right?

5              MR. KLUG:  No, your Honor.  Upon further reflection, I

6    don't want it to exceed the lodestar itself.

7              THE COURT:  Oh.

8              MR. KLUG:  If you say it's 1.1, give them the 1.1.

9              THE COURT:  OK.

10             MR. KLUG:  If it's less than that, less than that.

11             THE COURT:  Got it.  I thought you had said 20 percent

12   was your goal.  I think you maybe said that earlier, but then I

13   think you did indeed say that they should be paid the lodestar.

14             MR. KLUG:  Thank you.

15             THE COURT:  Fair enough.

16             Mr. Conway, did you want to get the last word?

17             MR. CONWAY:  Ordinarily, I wouldn't be saying anything

18   here.  I certainly don't take a position on the appropriateness

19   of the fee request.

20             THE COURT:  I hope you don't feel that from the Court

21   there's any constraint not to say anything.

22             MR. CONWAY:  Other than to say I'm glad Mr. Klug's not

23   reviewing our fees.  In terms of the merits, I only want to

24   speak to the merits to the extent that Mr. Klug said this was

25   some kind of a slam-dunk case.  The plaintiffs have to show and

G4lWtesC

1    have to plead scienter, and for a corporation that means they

2    have to plead and ultimately prove at trial that people at a

3    certain level, the highest level, of the corporation actually

4    knew about these overstatements.  The fact that there was an

5    overstatement by itself does not suffice.

6           In terms of the cases that Ms. Miller talked about,

7    Absolute Activist and Park Central in the Second Circuit, we

8    don't think there's any inconsistency between those cases and

9    your Honor's decision in Soc.Gen.  In particular, Absolute

10   Activist is completely irrelevant.

11          THE COURT:  Too fast.  After Soc.Gen., you then said?

12          MR. CONWAY:  We don't think there's any inconsistency

13   between Soc.Gen. and the two decisions of the Second Circuit

14   that Ms. Miller spoke about.  Absolute Activist is completely

15   irrelevant, and Park Central is a case that actually confirms

16   that the fact that you have a transaction that is domestic and

17   occurs in the United States does not eliminate the presumption

18   against extraterritoriality.  A transaction still can be not

19   beyond the reach of Section 10(b) even if physically it takes

20   place in the United States, a claim can be beyond the reach of

21   Section 10(b)  In terms of the *forum non* argument we made, Mr

22   Klug has essentially conceded because he admits that a claim

23   could be brought in the U.K., and there is absolutely no

24   dispute here that all the evidence, all the witnesses that

25   matter are in the U.K., so the plaintiffs here were at

G4lWtesC

1    substantial risk on the motion to dismiss, and that counsels in

2    fair of approving a settlement that's fair reasonable and

3    adequate in all respects  Thank you.

4            THE COURT:  I have one comment and one question.

5            MR. CONWAY:  Yes.

6            THE COURT:  The comment, of course, is that it's

7    pretty clear, and everybody here understands, that the motion

8    to dismiss was never resolved by me because the settlement

9    occurred at the time it was pending.  But could you just

10   briefly tell us what the status is.  Is there any litigation in

11   the U.K. against your client?  Briefly address Mr. Klug.

12           MR. CONWAY:  Not yet, your Honor, but there's been

13   plenty of publicity by both the United States and U.K. counsel

14   and litigation funders trying to put together a group that

15   could still bring a civil case, and it may very well be as Mr.

16   Klug says that they're awaiting the outcome of the

17   investigation being conducted by the U.K. serious fraud office.

18   There is no question that there are people in the U.K.

19   threatening a lawsuit, and that could very well come to pass.

20           THE COURT:  Thank you.

21           MR. CONWAY:  Thank you, your Honor.

22           THE COURT:  I think that brings us to a close.  This

23   has been a very helpful fairness hearing, actually, and I

24   appreciate counsel, and I appreciate Mr. Klug's comments as

25   well.  I will take them all into consideration.  It's very

G4lWtesC

1    likely, incidentally, what I will do is since we're so close to

2    the May 6 date is wait until we have the whole package.  We'll

3    know all the claims at that time, so I probably won't issue

4    anything before then.  I don't know if you want to come back

5    after May 6 and tell me the final results or send me a letter,

6    which would include the claims administrator fee and also the

7    number of claims ultimately.  I don't know if you need a little

8    more time -- you probably do -- after May 6 to clean this up,

9    but to me that sounds like a sensible way since we're so close

10   to that date anyway.

11          MS. MILLER:  Yes, your Honor.  The date is May 5, and

12   I have to ask Mr. Azari.  At that point you'll need more time

13   to know what your fees are going to be?

14          MR. AZARI:  We'll need to allow enough time for all

15   the claims to come in the door.

16          MS. MILLER:  There's probably going to be a handful of

17   late claims.

18          THE COURT:  Is two weeks after that date enough, do

19   you think, or what?

20          MR. AZARI:  It should be.  I mean, I can't imagine

21   that it would differ by a few, maybe something straggled in,

22   one or two, that's not going to be a substantive difference.

23          THE COURT:  I'll aim for May 24.  How is that?

24          MS. MILLER:  May 24.

25          THE COURT:  If you could, let me know by letter, if

G4lWtesC

```
1    you would, just these loose ends, not very many of that, what

2    they are.  Is that fair.

3            MS. MILLER:  We were going to give you the proposed

4    order now.  Would you still like us to?

5            THE COURT:  Yes.

6            MS. MILLER:  And the expenses now, and then we'll send

7    you an update thereafter.

8            THE COURT:  That's fine.

9            MS. MILLER:  Thank you.

10           THE COURT:  Again, very helpful today.  I really mean

11   that, and nice to see you all.

12           MR. CONWAY:  Thank you, your Honor.

13           MS. MILLER:  Thank you, your Honor.

14           (Adjourned)

15

16

17

18

19

20

21

22

23

24

25
```